VIRGINIA H. TUCKER, *Appellant*, v. J. L. FOUTS, *Appelle*.

Opinion Filed June 9, 1917.

1. If a third person in order to get some benefit for himself, or for any personal reasons, without the knowledge or consent of the borrower, pays a lender a bonus as an inducement for a loan, the borrower receiving the full amount and paying no part of the bonus and not affected pecuniarily thereby, the transaction is not an usurious one.

2. If a borrower promises to pay, or is in anywise obligated to pay a bonus or any part thereof for a loan, which bonus is paid or promised to be paid by a third party as any consideration for the loan, and the amount so paid or promised to be paid for which the borrower is in anywise liable, is in itself, or in addition to any interest paid or promised to be paid, more than the rate of interest which the statutes of Florida allow to be charged, collected or received, the transaction is usurious.

3. When a defendant sets up usury as a defense, the burden of proof is on him to establish it; but when the usury is proven the burden of proving that the holder of usurious paper purchased it before maturity without notice of the usury, is upon the party relying on such purchase.

Appeal from Circuit Court for Pinellas County; O. K. Reaves, Judge.

Decree reversed.

*Chas. B. Parkhill,* for Appellant;

*McKay, Withers & Phipps,* for Appellee.

BROWNE, C. J.— J. L. Fouts brought a bill to foreclose a mortgage against Mrs. Virginia H. Tucker in the Circuit Court of Pinellas County, Florida. The bill alleges in substance that Virginia H. Tucker, on the 10th of December, 1914, gave to the Bank of Safety Harbor, her promissory note of that date for $3000.00 payable 90 days thereafter, with interest after maturity at 8%; that on the same day she executed a mortgage deed to the Bank of Safety Harbor, for certain lands described in the bill, and that the Bank of Safety Harbor for value received, assigned, transferred, sold and delivered to J. L. Fouts, said note and mortgage on the 16th day of March, 1915. The bill was sworn to by the complainant.

Attached to the bill and made a part thereof is an assignment of the mortgage and note to J. L. Fouts, dated March 16, 1915, and the notarial certificate affixed to the assignment shows that it was executed on March 16th, 1915. To this bill the defendant filed her answer, setting up by way of defense that the Bank of Safety Harbor, did willfully and knowingly charge her $475.00 as inter-

est on the principal sum of $3000.00 lent by said Bank to defendant for a period of 90 days, and that she gave the Bank a promissory note for $400.00 payable 90 days thereafter. That the note for $400 was signed and executed by the Espiritu Santo Springs Company, a corporation of which the defendant was at the time President and a holder of the majority of the stock, and that upon the completion of the transaction the sum of $3000.00 so borrowed was placed to the credit of the Espiritu Santo Springs Company, which company checked it out from the Bank and used the same. She prays that the principal sum of $3000.00 and all interest thereon be forfeited to the defendant.

On the succeeding rule day the complainant filed an amendment to his bill of complaint wherein he alleges that the assignment of the note and mortgage to him by the Bank of Safety Harbor was made on March 6th, 1915, and that he was a bona fide purchaser of the note and mortgage for value before maturity and without notice. To the bill as amended the plaintiff filed her answer which was substantially the same as the answer to the original bill, except that it denied that for value received, the Bank of Safety Harbor assigned, transferred and delivered to the complainant, all its right, title and interest in said note and mortgage on March 6th, 1916, and denies that John L. Fouts was a bona fide purchaser of same for value before maturity and without notice.

The complainant filed his replication, and testimony was taken before a Master, and a decree rendered by the Circuit Judge in favor of the complainant for the sum of $3333.32, and $250.00 solicitors fees. From this final decree the defendant takes her appeal.

There are six assignments of error, but only the first five are argued by appellant, and as these present the

question whether the judge erred in rendering the final decree herein, we will follow the course adopted by the appellant in his brief, and discuss them together.

The first question presented for determination is, was the initial transaction an usurious one? The charges in the answer as to the circumstances of the transaction connected with the loan, are sustained by the testimony. Briefly the facts gleaned from the answer and the testimony are these: The appellant was the President of the Espiritu Santo Springs Company and owned a majority of its stock. That extensive developments were being made by the company on its property, and it was in pressing need for money to continue the work. When the mortgage and note were executed, the $3000.00 loaned thereon was placed to the credit of, and checked out by the Espiritu Santo Springs Company, and it was the beneficiary of the loan. W. E. Sinclair was the Vice-President and General Manager of the Company and the confidential adviser and trusted agent of Mrs. Tucker. He negotiated the loan with the Bank of Safety Harbor for Mrs. Tucker. There is no doubt that a charge of four hundred and seventy-five dollars for a loan of $3000.00 for ninety days, is over twenty-five per cent. per annum, and comes within the condemnation of the provisions of Section 5, Chapter 5960, Laws of 1909, which provides: "Any person, association of persons, firm or corporation, or the agent, officer or other representative of any person, association of persons, firm or corporation lending money in this State who shall willfully and knowingly charge or accept any sum of money greater than the sum of money loaned, and an additional sum of money equal to twenty-five per centum per annum upon the principal sum loaned, by any contract, contrivance or device whatever, directly or indirectly, by way of commissions, discount,

exchange, interest, pretended sale of any article, assignment of salary or wages, inspection fees or other fees, or otherwise, or for forbearing to enforce the collection of such moneys or otherwise, shall forfeit the entire sum, both the principal and interest, to the party charged such usurious interest, and shall be deemed guilty of a misdemeanor, and on conviction, be fined not more than one hundred dollars, or be imprisoned in the county jail not more than ninety days, or both, in the discretion of the Court."

It is contended by the appellee that because the note for four hundred dollars which was given for the loan, in addition to the seventy-five dollars, was the note of the Espiritu Santo Springs Company, it was a mere bonus, and that a bonus for a loan paid by a third person is not usury. A bonus paid by a third person may or may not cause a transaction to be usurious, according to the circumstances. Thus, if a third person in order to get some benefit for himself, or for any personal reasons, without the knowledge or consent of the borrower, pays the lender a bonus as an inducement for a loan, the borrower receiving the full amount and paying no part of the bonus and not affected pecuniarily thereby, the transaction is not an usurious one. This proposition is supported by the authorities cited by appellee, but neither this doctrine nor the facts in the cases cited, fit the facts in the instant case. Thus in Madison University v. White, 25 Hun. (N. Y.) 490, the facts were that John L. White and George C. White wanted to borrow $12,000.00 with which to purchase land. As an inducement, to Madison University to make the loan, one Joseph Mason subscribed and paid to the University Library fund two hundred and fifty dollars, without the knowledge or consent of either of the borrowers, who had the full benefit of the $12,000.00

without paying or promising to pay any part of the bonus, or anything but the legal rate of interest. Mason gave the bonus as an inducement for the loan, so that he might make a sale of the lands to the Whites who were to pay for the same with the borrowed money. This transaction was held not to be usurious. In the case of McArthur v. Schenck, 31 Wis. 673, cited by appellee, "A" wishing to buy a farm of "B" for two thousand five hundred dollars, applied to "C" for a loan of that sum. "C" refused to make the loan unless a bonus of thirty dollars was paid. "A" refused to pay the bonus. Rather than lose the sale, "B" paid the bonus, and the loan was made at legal rate of interest. This transaction was held not to be usurious.

In Clark v. Sheehan, 47 N. Y. 188, cited by appellee, Sheehan entered into a verbal contract with Clarke & Allen to furnish them with his composition for converting iron into steel,— for which Sheehan held a patent,— to be used by them in making pump barrels. Sheehan was also to harden pipes for them if they desired, at a stipulated price, and agreed not to furnish any of the composition to any other parties. Ten days later Sheehan applied to Clark & Allen for a loan of five hundred dollars to enable him to "go right along and furnish * * * the composition without delay." The parties acted upon this verbal agreement, and regarded themselves, when the loan was applied for, and agreed to be made, morally, though not legally bound by it. On application for the loan Clarke & Allen suggested that the verbal agreement be reduced to writing, and that a bond and mortgage be executed for the five hundred dollars, conditioned for the payment thereof with interest and that Sheehan faithfully fulfill the conditions of his contract, and in case he did not do so, the whole sum of five hundred dollars and interest should become immediately payable. The

Referee held the contract usurious, because Clarke & Allen as a condition of the loan, required that the verbal agreement be reduced to writing and signed, so as to make it of binding force; thereby intentionally securing in addition to lawful interest, valuable rights under and by virtue of the agreement. The Court of Appeals in reversing the finding of the Referee, said: "From the findings of the referee, it appears thtat the loan of $500.00 was not the inducement to the undertaking of the defendant Thomas Sheehan, to furnish composition and harden pipes for the plaintiff's firm, but that that engagement had been verbally made before the loan was suggested, and the loan was applied for by the defendant for the avowed purpose of enabling him to carry out such previous engagement. He was perfectly willing, and it seems desirous at that time, to furnish the composition and harden the pipes at the stipulated prices, and the referee has found that they were fair. The prices which he was to receive were evidently considered full compensation for the article and labor to be furnished. These prices were not fixed with reference to any loan of money, and when the loan was subsequently agreed upon, no rebate was made from them. It cannot be said, under these circumstances, that the agreement to furnish the composition and harden the pipes was an additional compensation paid by the defendant for the use of the money, even if it be conceded that the verbal agreement could not have been enforced." The court in discussing the legal proposition said: "I cannot agree to the soundness of this proposition. The mere fact that a loan of money on interest is the consideration for another contract, is not, in all cases, conclusive evidence of usury. If, by the collateral contract, some benefit is secured to the lender, for which the borrower does not receive an equivalent, and

which the lender would not have obtained, except for the loan, and which is intended as additional compensation for the loan, it is usury. But if provision is made for full compensation to the borrower for all he may do under the collateral contract, there is no usury. Usury consists of a corrupt agreement, whereby more than lawful interest is to be paid; and all shifts and devices which may be resorted to, for the purpose of covering up or concealing such an agreement, are ineffectual, if the intent to obtair more than legal interest for the use of the money can be discovered."

None of these cases fit the facts in this case, or support the contention of the appellee. Mrs. Tucker was the owner of considerable property, consisting of lands, and a majority of the stock in the Espiritu Santo Springs Company. She was interested largely in the development and improvement of the properties of the Espiritu Santo Springs Company, and was in dire need of money to continue the development. In this situation she sent her trusted agent and personal representative who was also Vice President and General Manager of the Espiritu Santo Springs Company to the Bank of Safety Harbor to effect a loan of $3,000.00 in order that the work of developing the Espiritu Santo Springs Company's lands might not be suspended. The contract was made with the bank by Sinclair, her agent; he agreed for her that she would individually give a mortgage for $3,000.00 on lands which she owned in her own name, and pay $75.00 in advance as interest, and the Espiritu Santo Springs Company, of which she was President and majority stockholder, would execute and deliver a note for $400.00 at 8% interest to the Bank of Safety Harbor.

It is clear from the testimony that the loan of three thousand dollars was for the Espiritu Santo Springs

Company, and that Mrs. Tucker, who regarded the affairs of that company as hers, mortgaged her property for the benefit of the Espiritu Santo Springs Company. She testified that she borrowed the $3,000.00 from the Bank of Safety Harbor "to advance the interest of the Espiritu Santo Springs Company, and to continue the work on the fill." When asked how much interest the bank charged her for the three thousand dollars for ninety days, replied: "I am afraid to trust to my memory, but Mr. Sinclair can answer this for me, as I have implicit confidence in him, and sincerely trust Mr. Sinclair; we were in dire need of money, and that was the reason I was so willing for him to mortgage the lots." When asked about the note for four hundred dollars given by the Espiritu Santo Springs Company, she said she "knew there was another note for four hundred dollars given for interest on the three thousand dollars which the Espiritu Santo Springs Company got the benefit of." In reply to a question whether "W. E. Sinclair, the Vice President of the Espiritu Santo Springs Company was acting for you in the borrowing of the three thousand dollars from the Bank of Safety Harbor, and what he did was with your consent and knowledge?" She said: "It certainly was; I told him to get the money on the best terms he could." Sinclair managed the entire transaction for Mrs. Tucker. He made the terms with the Bank, he handed Mrs Tucker the note for $3,000.00 to sign, he executed and delivered the four hundred dollar note with her knowledge and consent, whereby the company of which she was President and majority stockholder became obligated to pay the Bank four hundred dollars. Both notes and mortgage are dated December 10th, 1914; the $3,000.00 borrowed was placed to the credit of the Espiritu Santo Springs Company on that day, and was afterwards

checked out by the company. We fail to see how this transaction can possibly be brought within the rule that where a third person in order to get some benefit for himself, or for personal reasons, without the knowledge or consent of the borrower, pays a lender a bonus as an inducement for a loan, the borrower receiving the full amount and paying no part of the bonus, and not affected pecuniarily thereby, there is no usury. The transaction lacks nearly every element necessary to bring it within this rule. Unless we consider Mrs. Tucker and the Espiritu Santo Springs Company as practically the same person, the borrower, Mrs. Tucker, not only did not receive the full amount of the loan, but received none of it. If we regard the beneficiary of the loan—the Espiritu Santo Springs Company—as the borrower, the note for four hundred dollars given as an inducement for the loan, was not given by a third party, but the identical party who received the money from the loan. Even if Mrs. Tucker had received the entire amount borrowed, it cannot be said that the four hundred dollar note was given without her knowledge or consent, for she very clearly states that she knew of it, and authorized it, and did so because of the dire need which she was in; neither can it be said that she paid no part of the bonus, because as a majority stockholder in the Espiritu Santo Springs Company she would have to pay such proportion of the note as was represented by her interest in the company.

It is quite clear that the transaction by the Bank of Safety Harbor was an usurious one and in contravention of Section 5, Chapter 5960 Acts of 1909. The complainant, however, seeks to avoid the consequences of the usurious contract, by setting up that he is a bona fide purchaser of the note and mortgage for value, before maturity and without notice. Usury having been established,

the burden is on the complainant to prove that he is an innocent holder.

"The defendant having set up usury as a defense, the burden of proof is on him to establish it, but when the usury is proven, the burden of proving that the holder of the usurious note, purchased it before maturity without notice of the usury, is upon the party relying upon such purchase." 39 Cyc. 1085-86; Simpson v. Hefter, 87 N. Y. Supp. 243; Richardson v. Stone, 32 Neb. 617, 49 N. W. Rep. 763; Male v. Wink, 61 Neb. 748, 86 N. W. Rep. 472.

Has Fouts successfully fulfilled the requirements of the law which places on him the burden of proving that he is an innocent purchaser and had no notice of the usury, and that he bought the note before maturity? If he has failed to do this in either particular, he cannot recover.

Fouts in his sworn bill says he bought the note and mortgage from the Bank of Safety Harbor on the 16th of March, 1915. This was six days after maturity.

The original mortgage attached to the bill has two endorsements—one undated, which states that "for value received we hereby sell this mortgage without recourse to J. L. Fouts," and a second and more formal one which sells both note and mortgage to Fouts, which is dated March 16th, 1915, and duly acknowledged by E. N. Morrow, Cashier of the Bank of Safety Harbor, before a Justice of the Peace, who certifies that it was executed on the 16th of March, 1915.

Fouts filed an amended bill contradicting the statement in the original bill that the note and mortgage were bought by him on March 16th, 1915, and alleging that the Bank of Safety Harbor sold it to him on March 6th, and that the long assignment dated March 16th, was exe-

cuted by the Bank of Safety Harbor after the note and mortgage had become due and had been turned over to complainant's attorneys for foreclosure.

Fouts was Cashier of the Citizens Bank of Mulberry, and Morrow was Cashier of the Bank of Safety Harbor. Their version of the transaction resulting in the sale of the note and mortgage to Fouts, is that prior to March 5th, they had some talk about its sale by the Bank, and on that date Fouts told Miss Annie Glenn, Assistant Cashier of the Mulberry Bank, to telephone to Morrow at Safety Harbor and ask him if he would sell the $3000.00 note of Mrs. Virginia Tucker to Fouts; that Morrow said he would, and thereupon Morrow mailed the note and mortgage to him and he received them March 8th. Fouts being hard of hearing, the telephone conversation with Morrow was carried on by Miss Glenn on behalf of Fouts. She testified that nothing was said about what Fouts was to pay for the note and mortgage, nor how it was to be paid, and neither Fouts nor Morrow testify about any agreement as to how the money was to be paid, and on this vague conversation between Miss Glenn and Morrow, the latter endorsed the note and mortgage over to Fouts and sent them to him by mail, without knowing so far as the testimony discloses, how or when Fouts was to pay for them. Fouts says he gave the Bank of Safety Harbor credit on the Books of the Citizens Bank of Mulberry for fifteen hundred dollars and sent Morrow two checks of seven hundred dollars each. To corroborate this a duplicate deposit slip written on stationery of the Citizens Bank of Mulberry showing a deposit to the credit of the Bank of Safety Harbor of $1500.00 dated November 8th, 1915, was offered in evidence. Prior to the production of this deposit slip before the Master, L. C. Morrow, then the Cashier of the Bank

of Safety Harbor who had succeded E. N. Morrow in that capacity, examined the files of the Bank and could not find such a deposit slip. It was proven that Fouts was in the Bank of Safety Harbor with E. N. Morrow between the dates when L. C. Morrow could not find the slip, and the time when E. N. Morrow produced it. L. C. Morrow did not say the slip was not in the files of the Bank, but only that he had examined them and could not find it, and he sought to explain this by saying he had only been employed in the Bank a few months, and that it would take all the afternoon to go through all the files. Further to corroborate their testimony, the bill against the Mulberry Bank for telephone service for the month of March was offered in evidence, and it showed five conversations by Miss Glenn with Morrow, two at Clearwater and three at Safety Harbor, and the one on the fifth was with him at Clearwater; the next conversation between them was on the ninth at Safety Harbor. Fouts says the entry showing a conversation with Morrow at Clearwater on the 5th inst. is a mistake. Fouts testified that he had a phone conversation with Morrow on the fifth, and confirmed it on the sixth. There is no charge for phone service between the fifth and the ninth.

In the Minute Book of the Directors of the Bank of Safety Harbor there appears this entry, dated March 15th, 1915, and signed by five of the Directors: "We the undersigned directors of the Bank of Safety Harbor hereby authorize the sale of the Virginia H. Tucker Mortgage and Note for $3000.00 to J. L. Fouts." The Teller's Daily Balance Book of the Bank of Safety Harbor shows an entry on March 16, 1915, of a credit to Citizens Bank of Mulberry under heading "Notes Payable" "Number thirty-eight, Three thousand dollars." The Cashier testified that the note number 38, was the Vir-

ginia Tucker note, and the entry represented that the
Virginia Tucker note was paid on that day. Morrow, the
former Cashier, who made the usurious contract with
Mrs. Tucker's agent, in an attempt to explain this, says
that on the 8th or 9th of March, he received a credit slip
from Citizens Bank of Mulberry showing that there had
been deposited to the credit of the Bank of Safety Har-
bor $1500.00, and two checks for $750.00 each, which
Fouts asked him to hold until he needed the money and
that he did not credit the note as paid, or charge the Cit-
izens Bank until November 16th, 1915.

To meet the burden of proving that he took the note
before maturity, we have Morrow's and Fouts' testimony
that the sale was consummated between the 6th and 8th
of March. Against this, we have Fouts' sworn statement
in the bill, that he bought the note on the 16th; the entry
in the Minute Book of the Directors of the Bank of
Safety Harbor on March 15th, authorizing the sale of
the Virginia Tucker note for $3000.00 to J. L. Fouts;
the entry in the Books of the Bank that the note was paid
on the 16th, and a credit on that day of $3000.00 in favor
of Citizens Bank of Mulberry, of which Fouts was
Cashier, Fouts and Morrow say that all these records are
mistakes, but it is taxing our credulity to too great an
extent to expect us to believe that chance alone caused all
but one of these mistakes to be made on the same day
and that chance alone controlled the dating of the minute
entry on the Directors' Books authorizing the sale of the
Virginia Tucker note to Fouts on the 15th of March, the
day before the other entries show the sale was finally con-
summated.

There are two letters from Fouts to Sinclair which
strongly support the appellant's contention that Fouts
bought the note after maturity. One dated March 8th,

the day before the Virginia Tucker note became due, reads: "Reference to your conversation of yesterday, have to state that I will not alter the terms quoted in my letter to you. I have succeeded in getting this money, and if the deal is not made by Thursday of this week, the same will be returned, and I will not again take this matter up with my people. It is up to you as to whether you wish it on these terms and conditions, but it will be useless to go into this matter again after Thursday, as I will return the money." Without going over his testimony in detail, it is sufficient to say that through his entire testimony on this point, he is very positive and emphatic that he was not to furnish the money to Sinclair from his own funds, but was to get it from other sources, and that the thousand dollars he was to receive was "commission." Notwithstanding Fouts' attempted explanation of the language of this letter, that "if the deal is not made by Thursday of this week, the same will be returned," it seems quite clear to us that the transaction stood on the 8th, precisely as it did on the 28th of February, when Sinclair applied to him to raise funds to pay off Mrs. Tucker's indebtedness to the Bank, and that Fouts did not buy the note until after the 11th of March, two days after maturity. In this letter he makes use of these expressions: "If the deal is not made by Thursday of this week, the same will be returned, and I will not again take this matter up with my people;" and "it will be useless to go into this matter again after Thursday." The "matter" which Sinclair and Fouts were negotiating about was a loan from friends of Fouts to Mrs. Tucker to take up her note and mortgage held by the Bank of Safety Harbor, and his entire letter negatives any theory that at that time Fouts, and not the Bank owned the note. On March 16th, Fouts notified Sinclair

by letter that he holds the note of Mrs. Tucker, thus adding another circumstance to support the theory that the sale was consummated on that date. Finally, we have the testimony of Mr. Sidney Washington, one of the directors of the Bank of Safety Harbor, that he understood that the note was sold to Fouts after it became due, and that he made objections to its being so sold.

We think the appellee has not only failed to meet the burden of proof which was on him, to show that he took this note before maturity, but that the evidence clearly establishes that he took it after it became due. The rule is clear that one who purchases an usurious note after maturity, takes it subject to the defense of usury which may have been set up against the original holder.

The evidence is still stronger that Fouts had notice of the usurious character of the transaction between the Bank of Safety Harbor and Mrs. Tucker. Sinclair testified that having learned that the Bank of Safety Harbor would not extend the note when it came due he sought elsewhere to raise the money to take it up, and entered into negotiations with Fouts with that end in view. They had an interview in Tampa on Sunday the 28th of February, 1915, and then took an automobile and went to Safety Harbor and looked at the lots, and Fouts said the security was sufficient, and that if Sinclair would pay $1000.00 for the money for six months he would let him have $3000.00, and if he could not pay it when due, Fouts would renew it for another six months. Sinclair says that at this time he explained to Fouts the $475.00 interest he had paid the Bank of Safety Harbor for the loan to Mrs. Tucker, and that the bank was taking advantage of him. Fouts denies that Sinclair told him about having paid the Bank $475.00 for the loan to Mrs. Tucker.

Sinclair's statement is more probable, as it is usual

for one seeking a loan with which to take up another about to become due, to state all the circumstances connected therewith. It also seems probable that Fouts being told by Sinclair that he had agreed to pay the Bank of Safety Harbor $475.00 for a loan of $3000.00 for ninety days, was what prompted him to demand $1000.00 for the loan of the same amount for six months.

It appears that Sinclair was willing to submit to this hard bargain, but on March 3rd, Fouts wrote him to the effect that he would get the loan for him, but Mrs. Tucker must give her note for $4120.00 payable in six months, secured by a mortgage on thirty-five lots instead of twenty-seven as offered; that there was to be no contract providing for further extension, and making other hard terms. The testimony does not show that Sinclair replied in writing to this letter, but in Fouts' letter of March 8th he says "reference to our conversation," etc. It is apparent from this that between March 3rd and 8th, there was a conversation between Fouts and Sinclair in relation to this transaction. Sinclair says it took place in Safety Harbor on the 3rd or 4th of March. Fouts denies that he was in Safety Harbor any week day in March except the 10th, but makes no attempt to explain where the conversation referred to in his letter of the 8th took place. It was not a telephone conversation for the bill for such service for March shows no conversation between Fouts and Sinclair. Miss Alma Pearce, O. M. Goodrich and Sinclair say it occured in Sinclair's office in Safety Harbor on the 3rd or 4th of March. Sinclair says that on this occasion he again told Fouts about the $475.00 he had paid the Bank of Safety Harbor for the loan, and when Fouts got angry and threatened to buy the note and put him in a hole, he shook his finger in Fouts, face and said "I notify you if you buy that paper

after what I have told you, you are not an innocent purchaser." Both Miss Pearce and Goodrich fully corroborate Sinclair in this particular. Fouts denies this, and denies that he was in Safety Harbor any week day in March before the tenth. His Assistant Cashier says that Fouts was not absent from Mulberry any time between the 1st and 10th of March, but her knowledge is derived from the fact that on those days the entries in the books are in Fouts' handwriting. Mulberry and Safety Harbor are not so far apart that Fouts could not have gone there and returned on the same day in time to have written up his books. The conclusion is inevitable from Fouts' letters of March 3rd and 8th that a conversation took place between him and Sinclair between those dates, and the testimony of Miss Pearce and Goodrich is positive and convincing that it took place in Sinclair's office in Safety Harbor, and that on that occasion Sinclair informed Fouts of the usurious character of Mrs. Tucker's note which he afterwards bought and is seeking to collect in this cause.

We are satisfied from the testimony that Fout bought Mrs. Tucker's note from the Bank of Safety Harbor after maturity, and that he had notice of the usury with which it was tainted, and has therefore forfeited the entire sum both principal and interest. Having reached this conclusion, it is not necessary for us to pass upon the effect of Section 5 of Chapter 5960 Acts of 1909, on an innocent holder for value before maturity.

The decree is reversed.

TAYLOR, SHACKLEFORD, WHITFIELD and ELLIS, JJ., concur.