**In the Matter of Bartley L. & Elaine MICKLER, Debtor.**

**Bartley L. MICKLER, Plaintiff,**

v.

**MARANATHA REALTY ASSOC., INC., Defendant.**

Bankruptcy No. 80–1226.
Adv. No. 81–92.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

June 14, 1985.

**820**

Don M. Stichter, Tampa, Fla., for plaintiff.

Neil Butler, Tallahassee, Fla., for defendant.

---

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a Chapter 11 reorganization case and the immediate matter under consideration involves a civil action originally filed by Bartley L. Mickler against Maranatha Realty Associates (Maranatha) and Stanley E. Kreimer (Kreimer) in the Circuit Court of the Sixth Judicial Circuit, Pasco County. The action was removed on Motion of the Defendants to the United States District Court for the Middle District of Florida, Case No. 79–1171–Civ.–T–GC.

On August 20, 1980, Bartley L. Mickler and his wife, Elaine Mickler, filed their joint Voluntary Petition for Relief pursuant to Chapter 11 of the Bankruptcy Code. On February 20, 1981, the civil suit which was then pending in the District Court was removed to this Court. Maranatha and Kreimer filed several claims in this Chapter 11 case. In due course, the Micklers objected to the allowance of these claims. In addition, they also filed an adversary proceeding against Maranatha and Kreimer which involved the same issues as the civil suit in the District Court. The adversary proceeding and the objections to claims were consolidated for trial.

The original complaint, as amended, set forth three claims in separate Counts. The claim asserted in Count I is based on the theory of slander of title and seeks compensatory damages in the amount of $900,000 plus punitive damages. In support of this claim, Mickler alleges that on August 7, 1979, Maranatha and Kreimer, without Mickler's consent, re-recorded a mortgage, previously executed by the Micklers and recorded in the Public Record, and that the re-recorded mortgage contained a legal description different from that in the original mortgage and purported to encumber a substantially larger tract of land than which was encumbered by the original mortgage.

The claim in Count II seeks to cancel a promissory note, mortgages and an option and also seeks a determination of the validity and extent of the Defendant's interest in property owned by the Micklers. In support of this claim, Mickler alleges that he was induced by one Earl Strother to execute (1) a promissory note in the amount of $400,000 in favor of Maranatha

and Kreimer; (2) a mortgage recorded February 6, 1979 and re-recorded on August 7, 1979; and (3) an option dated January 31, 1979 for which he received no consideration.

Count III seeks cancellation of a promissory note and mortgage, and a determination of the validity and extent of the Defendants' interest in the property. The relief sought is based on the contention that Mickler did not execute or authorize the execution of a promissory note in favor of Maranatha in the amount of $400,000 and a mortgage, both dated July 15, 1978. Further, Mickler alleges that he did not receive any consideration in exchange for the execution of these instruments.

In response to Mickler's complaint, Maranatha and Kreimer each filed a counterclaim in which they essentially seek either validation of the re-recorded mortgage based on mutual mistake as to the legal description in the original mortgage, or in the alternative, damages for fraudulent inducement to lend money. Maranatha and Kreimer seek to recover the monies claimed to be due as evidenced by the promissory note dated January 31, 1979. The Micklers filed an "answer" (sic) to the counterclaims and asserted affirmative defenses of total failure of consideration for the note and mortgage and usury.

On March 5, 1982, Maranatha and Kreimer filed a Motion for Partial Summary Judgment on two issues relating to Mickler's defense of usury contending that the transaction was controlled by the laws of Georgia, therefore, based on the laws of Georgia, the transaction was not usurious. On May 3, 1982, this Court entered a Partial Summary Judgment in favor of Mickler having concluded that, "... the loan transaction shall be governed by the laws of Florida as existed prior to July 1, 1979 ..." and that the maximum allowable rate of interest is 10% per annum. This determination was affirmed on appeal by order of United States District Court on March 31, 1983. Thus, there is no doubt that the transaction is civilly usurious on its face simply because the promissory note executed on January 31, 1979 carried an interest rate of 12% per annum.

The matters currently under consideration represent, without a doubt, the most significant and complicated controversy involving the Micklers. The relevant factual background spans a period of approximately three and one-half years. Due to the number of players, the complexity of the transactions and the several claims asserted in this action, it is necessary to trace the factual background in detail.

At the time relevant, the Micklers were, and still are, the owners of a large tract of land located in West Pasco County, Florida. Although Mickler originally held approximately 5,000 acres acquired from his father in the 1940's, his holdings shrunk to 1,600 acres by 1978. As early as 1976 the Micklers began to experience financial difficulties and Mr. Mickler began to pursue alternative methods to produce income. As part of this endeavor, on August 7, 1976, Mr. Mickler entered into a six month agreement with W.E. Strother, Jr. (Strother) and John Barry Allen (Allen) who agreed to prepare a detailed master plan for the development of approximately 2,000 acres owned by the Micklers fronting on Highway 19, Pasco County, Florida (Pl's Exh. No. 30). The first phase of the Master Plan was to be designed in large part to include the development of (1) a retirement village; (2) a commercial shopping center and (3) an entertainment complex including a dinner theatre. The agreement with Strother and Allen provided, in part, that neither Allen nor Strother were granted any authority to contract for services on behalf of Mickler or to bind Mickler contractually without express written authority by Mickler.

On August 20, 1976, approximately two weeks after the Allen-Strother agreement, Mickler borrowed $1.8 million from Community Bank of West Pasco. This loan was secured by a mortgage encumbering his real properties located in Pasco County. In the summer of 1977, Mickler borrowed an additional sum of money from Ranon & Jiminez, Inc., a local construction company.

This loan was obtained by Mickler in connection with the proposed shopping center project to be built by Ranon & Jiminez. To secure this loan, Mickler executed a mortgage in favor of Ranon & Jiminez on part of his real property (Dep. of Bartley Mickler, Df's Exh. No. 4, p. 14 1. 6–7).

In May, 1978, Mickler was sued by Anclote Psychiatric Center, Inc., a psychiatric hospital and ultimately suffered a judgment in the amount of $48,913.04. The judgment was duly recorded and thus became a lien on his real estate located in Pasco County. In addition to these borrowings, Mickler sold off some of his acreage and also dabbled in other business ventures such as a restaurant, albeit unsuccessfully. Needless to say, the financial condition of the Debtor continued to deteriorate and he was constantly in dire need of funds. The project undertaken by Strother and Allen failed to produce anything concrete under the "Master Plan" and at the expiration of the six months, Allen departed.

Despite the expiration of the six month term of the 1976 "Master Plan" agreement between Mickler, Strother and Allen, Strother remained on the scene and continued to pursue the shopping center-dinner theatre project well into 1979. Particularly, Strother sought to obtain "seed money", that is, money needed to generate additional funding, construction financing and permanent, or "take-out" financing. It is without serious doubt that Strother exercised rather wide latitude with regard to Mickler's financial affairs or at least with regard to the use of Mickler's money although there is no evidence in the record that Mickler ever expressly authorized Strother to do so. Strother was never granted a Power of Attorney by Mickler and it is clear that Strother frequently acted without Mickler's knowledge and consent. There is no doubt that Mickler relied heavily on others to monitor and execute his business affairs, however, it appears that his primary advisor was his attorney, Joe McClain, in whom Mickler placed total confidence.

This is the basic factual background which sets the stage for the entrance of Maranatha and ultimately Kreimer. Maranatha is a Georgia corporation formed in November, 1977 (Dep. of Hamilton, Pl's Exh. No. 29, p. 5–6). The business of the corporation was operated from the Marietta, Georgia residence of Herbert M. Hamilton, Jr. (Hamilton) who was the President of Maranatha, as well as a 60% stockholder. He also served as its director. Other stockholders in the corporation were Barbara Price (20%) and John Stone (20%), residents of Sarasota County, Florida, neither of whom were active in the day to day operations of Maranatha. Hamilton, prior to forming Maranatha was an insurance man who later on became an ordained minister and then re-entered the business world in the areas of real estate and insurance.

Hamilton was introduced to Strother by George Foote, an architect who was performing some architectural services for Mickler in Holiday, Florida. Strother, who was anxious to procure financing for the shopping center-dinner theater project, began to pursue Maranatha via Hamilton in order to obtain the required "seed money." In June, 1978, Hamilton arranged for a meeting to be held in Sarasota so that Strother could present his shopping center/dinner theatre proposal to William Price (Hamilton's uncle) and John D. Stone. As a result of that meeting, Strother, on behalf of an entity known as Bartlain, Inc.; Price, on behalf of Maranatha; and Stone, apparently in his individual capacity executed an undated agreement (Pl's Exh. No. 16). This agreement provided, in part, for a loan committment in an amount not less than $150,000 nor more than $400,000 for a term of one year at an interest rate of 12%. The agreement recognizes Micklers' difficult financial situation and notes the "urgency for immediate funds" thereby justifying an investment incentive of 10% per year for 25 years on the amount ultimately loaned. The agreement sets forth conditions that (1) the loan shall be secured by a second mortgage on the 1,600 acres subject to the first mortgage limit of $1,800,000;

(2) the personal guarantee of all owners; and (3) a guarantee on the 10% incentive interest in the form of a second mortgage on the shopping center, a retention of the personal guarantees, and a twenty-five year consulting agreement to Maranatha. The agreement further provided for a 10% *fee* on all funds raised, from whatever source, and upon payment of the $150,000, the lender would retain $30,000 representing a $15,000 earned fee and $15,000 to be earned upon Maranatha's fulfilling its best efforts to obtain additional funding. Finally, the agreement states that "... fees on the obtaining of construction funds shall be 1½%." It should be noted that the agreement granted Maranatha the placement powers of all insurance on the shopping center plus all life insurance, and reserves to Earl Strother, individually, 40% of all net commissions from insurance. There is no doubt that Mickler was never made aware of or consulted about the execution of this agreement, let alone its terms.

Hamilton proceeded to seek construction financing and in early July 1978 Price arranged a meeting to be attended by Hamilton and Strother with two officers of Florida National Bank (Bank), Bill James and Fred Duchow. It appears that although the Bank may have expressed some interest in the Mickler project, there is no doubt that this was nothing more than an informational meeting and the Bank made absolutely no commitments, but merely invited the submission of a completed loan application including (1) financials on Mickler and Bartlain; (2) a survey of the property; (3) cost analysis and specifications; (4) evidence of lease income; and (5) the name of the "take-out" lender. The record is clear that Strother never provided the required documents to the Bank and a commitment was never forthcoming. Although construction financing was never obtained from the Bank, Maranatha claims a $100,000 "earned" commission for finding a construction lender based on this rather perfunctory and basically meaningless meeting.

It is without serious dispute that by July 15, 1978, Strother received $18,000 consisting of $3,000 cash and a $15,000 check from Maranatha·(Df's Exh. No. 2, Df's Exh. No. 11). Strother provided to Maranatha a package of documents dated July 15, 1978 which were purportedly signed by Bartley and Elaine Mickler, notarized and witnessed, although the record is clear that Strother forged the signatures on the documents. This package included a letter summarizing the earlier written agreement (Pl's Exh. No. 16); a mortgage deed encumbering approximately 1,894 acres owned by the Micklers subject to a first mortgage of Community Bank of West Pasco; a mortgage deed encumbering 47 acres purportedly owned by Bartlain, Inc.; a promissory note in the face amount of $400,000 plus 12% interest; a real estate consulting contract; loan agreement; and a letter written by Strother acknowledging that Maranatha "... is entitled to a fee of 1½% for the placement of the construction loan with Florida National Bank." (Pl's Comp.Exh. No. 3). In the cover letter accompanying the package, Strother refers to $30,000 which would be "held as a fee" by Maranatha and would reduce the amount to be advanced by Maranatha accordingly. It should be noted that $30,000 was withheld by Maranatha from the sums disbursed in July, 1978 (Df's Exh. No. 11) although $10,000 is characterized by Maranatha as interest withheld and $20,000 is characterized as commission due Maranatha for the placement of the "Jim Adams/Bache Loan" (Df's Exh. No. 11).

The "Jim Adams/Bache Loan" refers to a potential lender of "seed money". It appears that rather than producing the total sum of $400,000 itself, Maranatha decided to procure the participation of a second party, John Adams (Adams), to supply part of the "seed money." It seems that in order for Maranatha to close the "deal" with Adams, Adams required title binders which Strother asked McClain, Mickler's attorney, to provide. Two title binders were ultimately prepared by Southern Title Insurance Company on August 11, 1978 (Pl's Exh. No. 2). One was made out to Maranatha in the amount of $200,000 and

the other to Adams in the amount of $200,-000. Although Adams was financially able to provide the seed money, he declined to complete the transaction because the title binders were not timely produced. Nevertheless, Maranatha claimed to have earned a $20,000 commission as of July 15, 1978 for bringing Strother and Adams together (Df's Exh. No. 11).

By August 1, 1978, Strother had received payments from Maranatha totalling $70,-000 (Df's Exh. Nos. 2, 3, 4). Again, there is no evidence that Mickler received any portion of these advances or knew any detail of Strother's transactions with Maranatha. It is clear, however, that at this point, McClain was advised of a possible arrangement for "seed money" with Maranatha and Adams, and he asked Mickler if he could prepare the documents requested by Strother. Mickler gave McClain the "go ahead" and authorized McClain to prepare the documents. It appears that in September, 1978, McClain advised Mickler that the "deal" had fallen through. In spite of the continued lack of success to obtain the necessary seed money, the saga continued to unfold during the fall and winter of 1978 and took a significant turn with the appearance of Kreimer, who appeared on the scene as a potential "seed money" lender to replace Adams. At this point, Strother and Hamilton sought contacts with Tri-State Teachers and Public Employees Pension Trust who were targeted as a potential construction lender and source of furnishing necessary funds to finally launch the project.

Kreimer operated a real estate investment business in Georgia, but had no experience in the development, construction or operation of shopping centers. Kreimer was introduced to Hamilton early in January, 1979 by Hugh Hunter, a real estate broker (Pl's Exh. No. 33, Dep. of Kreimer, p. 3–4) and Hamilton immediately presented the shopping center/dinner theatre project to Kreimer as an investment opportunity.

In return for a $100,000 investment, Kreimer was to receive one-half of $200,-000 of "earned" commissions for the placement of the Florida National loan and the Tri-State Teachers loan; plus 12% interest on the $100,000 investment; plus $20,000 per year for 25 years as incentive for investment. It should be noted that Kreimer was not ever around and known to any of the parties at the time Strother and Hamilton met with the officers of the Bank. There is no evidence in this record that Kreimer undertook any responsibility with respect to the placement of a construction loan. There is no doubt that by the time Kreimer became involved, the Bank's "deal" was already dead and Kreimer, by his own admission, had nothing to do with the "Tri-State Teachers" loan negotiations. In fact, the evidence reveals that Hamilton introduced Ted Jones (Jones) the President of Avesta, Inc. to Strothers. Jones contacted James Pohrer (Pohrer) who was involved with Tri-State and it was Pohrer who presented the shopping center/dinner theater idea to Tri-State. On January 26, 1979, Jones wrote a letter to Strother which confirmed that the shopping center proposal had been considered by Tri-State at a meeting on January 11, 1979; and that although the Tri-State was enthusiastic about the project, additional information was required before Tri-State would act further (Df's Exh. No. 1). Again, Strothers did not furnish the additional information to Tri-State and the "deal" progressed no further. Nevertheless, Maranatha claimed a commission in the amount of $100,000 for placement of the Tri-State loan.

As noted above, Kreimer agreed to provide $100,000 "seed money." Kreimer's attorney, Frank Shannon drafted a second set of documents to replace the package which had been signed by Strother on July 15, 1978. The replacement package dated January 31, 1979 included a mortgage note in favor of Maranatha and Kreimer in the amount of $400,000 plus interest at a rate of 12% per annum. The note was made due and payable on June 29, 1979. The face amount of the note represented (1) $100,000 advanced by Maranatha with interest from July 15, 1978, (2) $100,000 ad-

vanced by Kreimer with interest to accrue from the date of the note and (3) $200,000 for "services previously rendered by the Payees for the benefit of the Makers." The package also contained two mortgages; an agreement to pay Kreimer the sum of $20,000 per year for 25 years payable in quarterly payments commencing on the day the shopping center opened or on December 1, 1979, whichever date was sooner; a Consulting Agreement with Maranatha on essentially the same terms, i.e. $20,000 per year for 25 years. It should be noted that there was no financing, either construction or "take-out financing" in place when these documents were drawn and executed.

The package further included an "Owner's Affidavit" and an "Option" which provided that "The undersigned hereby give unto Maranatha Realty Associates, Inc. and Stanley E. Kreimer, the sole right to purchase said property in the event of any default under the terms of the Four Hundred Thousand & no/100 ($400,000) Dollar note and Mortgage executed by the undersigned to Maranatha Realty Associates, Inc. and Stanley E. Kreimer ..." for the sum of $100 (Pl's Exh. No. 4). These documents were each signed by Bart and Elaine Mickler, however, the manner in which Strother obtained the signatures is somewhat suspect.

It appears that on January 30, 1979, Strother called the Micklers, who during all this time resided in North Carolina, and asked them to meet him the next day at an airport in Elkins, North Carolina. At the time Strother arrived, the airport was in the process of closing. Immediately upon his arrival, Strother asked for a Notary and the airport manager called his mother, Betty Parker, to come to the airport and notarize the documents. Strothers advised the Micklers that Joe McClain had reviewed the documents and told them to sign the various papers despite the fact that they had not read them. It appears that Strothers also told the Micklers that Maranatha and Tri-State were one and the same. Based on these representations, Bartley and Elaine Mickler signed all of the documents de-scribed above. There is no doubt that McClain never saw the package presented to the Micklers for signature.

Between February 1, 1979 and February 14, 1979, Kreimer deposited $95,000 in three installments in escrow with Shannon's law firm (Df's Exh. No. 5). Five thousand dollars was retained by Kreimer as interest withheld. The amount ultimately distributed to Strother from the Kreimer contribution equalled $75,500 distributed as follows: $17,000 received by W.E. Strothers, Jr., February 1, 1979; $10,000 received by W.E. Strothers, Jr., February 8, 1979; $7,500 received by W.E. Strothers, Jr., February 12, 1979; $36,000 received by W.E. Strothers, Jr., February 15, 1979; $5,000 received by W.E. Strothers, Jr., March 5, 1979 (Df's Exh. No. 11) (Pl's Exh. No. 14). There is no evidence in this record that the Micklers ever directly received *any* of the monies advanced either by Maranatha or Kreimer, although it appears that Strother may have made certain payments on behalf of Mickler.

On June 1, 1979, Hamilton wrote a letter to Mickler in which he expressed concern about the project (Pl's Exh. No. 7). He also indicated concern over the status of the $400,000 note and suggested a meeting "... to discuss the current status of your development ..." A meeting was conducted on June 6, 1979 in Holiday, Florida and for the first time Bartley Mickler and Hamilton met face to face. The record fails to reveal what actually transpired at the meeting, and the testimony is in total conflict. However, on June 8, 1979, Hamilton sent Mickler a second letter which provided a payment schedule for the obligation due on June 29, 1979 (Pl's Exh. No. 8).

Mickler did not respond to the letters and did not make any payment on the note. On June 28, 1979, Hamilton again sent another letter demanding payment and also suggested that if Mickler paid $15,000 by Friday, June 29, Maranatha would extend the time of payment to July 6. Hamilton also stated that Mickler could extend the due date of the note until July 31, 1979 with an

additional payment of $35,000. Of course, these payments were in no way intended to reduce the original obligation (Pl's Exh. No. 11). While there is no evidence in this record that Mickler paid any of these sums demanded by Hamilton, Strother paid to Maranatha the sum of $10,000 (Pl's Exh. No. 17) on July 6, 1979.

On July 31, 1979, Shannon wrote to the Micklers and advised them of Maranatha and Kreimer's intent to exercise their option (Pl's Exh. No. 12) to buy their land. On December 11, 1979, the Micklers were tendered a check in the amount of $100 (Pl's Exh. No. 28).

It is without dispute that in August of 1979, Maranatha and Kreimer caused the January 31, 1979 mortgage to be re-recorded. This mortgage carried a different legal description and covered a larger tract of land than the original mortgage.

The first matter to be considered is the "slander of title" claim of the Micklers for which they seek compensatory damages in the amount of $900,000 and punitive damages.

As noted earlier, on January 31, 1979, the Micklers executed a $400,000 note and mortgage in favor of Maranatha and Kreimer to secure the repayment of the note. It is also without dispute that the mortgage was recorded in the public records of Pasco County; and that in August of 1979, Hamilton re-recorded the mortgage to which he attached a legal description which included property not covered by the original mortgage. Mickler was aware of Hamilton's intent to re-record, but did not consent to the re-recordation. It is Hamilton's position that he entered into the January 31 loan agreement based on the representation by Strothers that the mortgage covered the same property on which Community Bank of West Pasco held a first mortgage. Upon discovering that the mortgage, in fact, covered substantially less property, Hamilton sought Mickler's agreement to re-record. Upon Mickler's refusal, Hamilton sought advice of local (Florida) counsel and re-re-corded the mortgage without Mickler's consent.

In order to recover in an action for slander of title, the Plaintiff must show false and malicious words or utterances that disparage the title of another and cause actual pecuniary loss or damage. Malice generally means a lack of legal justification and is presumed where the disparagement is false, caused damage and is not privileged. *Gates v. Utsey*, 177 So.2d 486 (Fla. 1st DCA, 1965). In the case at bar, it is unnecessary to discuss each of the elements of this claim inasmuch as the Court is satisfied that Mickler failed to establish that he sustained any damage as a result of the re-recordation. The claim of the Micklers is without substantial evidentiary support that a sale to Embassy Builders was frustrated by the re-recordation. Furthermore, the record fails to support Mickler's allegation that due to the re-recordation, he "lost" a sale to George Hunt Construction Co. Finally, the Court cannot accept the contention that the re-recordation caused the Micklers to seek relief under Chapter 11 because the sales referred to above did not transpire and, therefore, they were unable to reduce the $1.8 million indebtedness owed to the Bank which obligation matured on August 20, 1980. In short, the Micklers simply failed to sustain their burden on the issue of damages. Therefore, their claim based on slander of title must be rejected.

The record is clear that the documents of July 15, 1978 were forged; that the Micklers had no knowledge of the transaction and received no consideration for the execution of these documents; and finally, the July 15, 1978 package was replaced by the documents executed by Bartley and Elaine Mickler on January 31, 1979. Next, considering the claim of the Micklers set forth in Count III of the Complaint in which they seek the cancellation of the July 15, 1978 note and the mortgage, it is clear that they are entitled to the relief sought. Moreover, neither Maranatha nor Kreimer make any claim against Mickler based on the July 15, 1978 package, but contend that

the January 31 package represents the ultimate "deal" struck between Mickler, Kreimer and Maranatha.

This leaves for consideration the crux of the entire controversy which is embodied in several pleadings. First, in Count II of the Amended Complaint of the Micklers in which they seek a declaration that the note, the mortgage and option executed by them are void because while they were fraudulently induced by Strother to execute these documents, they received no consideration. Therefore, neither the note nor the mortgage are enforceable based on total failure of consideration. Of course, Maranatha and Kreimer seek a money judgment against the Micklers in their counterclaim based on the same note; a validation of the re-recorded mortgage or in the alternative, damages for fraudulent inducement to lend money. In addition, as noted earlier, the Micklers also asserted affirmative defenses of failure of consideration, civil usury (which this Court has already determined) and challenge the enforceability of the note and the mortgage based on the claim that the transaction was criminally usurious, thus, totally unenforceable by virtue of F.S. 687.071.

■ Based on this record, this Court is satisfied that the Micklers never directly received any of the funds advanced by Maranatha to Strother. Nevertheless, whether Mickler can prevail on the defense of failure of consideration depends on whether Maranatha and Kreimer can sustain the burden to establish an agency relationship between Mickler and Strother. This is true, because if an agency relationship is established, a payment to the agent is deemed to be a payment to the principal. *See, First National Bank v. Landress*, 112 Fla. 348, 150 So. 589 (1933). There is no doubt that Bartley and Elaine Mickler signed the note, mortgage, option and long term agreements with Kreimer and Maranatha on January 31, 1979. Thus, the essential questions are whether Strother had the authority to receive monies on their behalf, or if not, whether Mickler ratified

Strother's acts of collection of the monies after the fact.

■ The Court is satisfied that Strother had neither actual nor apparent authority to act on behalf of the Micklers. However, the law is clear that the binding effect of an agent's acts is not necessarily dependent upon the existence of the authority at the time the act was performed. Rather, acts which are performed outside the scope of an agent's authority, or which are performed by one who is not even an agent may be ratified by the principal. *Armstrong v. Blackadar*, 118 So.2d 854 (Fla. 2d DCA 1960).

■ Ratification of acts, either outside the scope of the agency or performed by one who purports to be an agent, may be express or implied. *Croom v. Swann*, 1 Fla. 211 (1847). However, whenever a principal "... is sought to be held liable on the ground of ratification, either express or implied, it must be shown that he ratified upon full knowledge of all material facts, *or that he was willfully ignorant, or purposefully refrained from seeking information*, or that he intended to adopt the unauthorized act at all events, under whatever circumstances." (emphasis supplied). *Bach v. Florida State Board of Denistry*, 378 So.2d 34 (Fla. 1st DCA 1979); *citing Oxford Lakeline v. First National Bank*, 40 Fla. 349, 24 So. 480 (1898).

■ Based on the facts, this Court is satisfied that although Mickler never expressly authorized Strothers to collect monies on his behalf, Mickler consistently relied on others to conduct his business affairs. In fact, Mickler made it clear that he relied on McClain and Strother and that he did not actively participate in any of the development activities. The record is replete with instances where Mickler completely disavowed any responsibility for his own affairs. While it is evident that he expected to reap the ultimate rewards, he left the actual means of obtaining the rewards to others. In this regard, the Court finds that Mickler remained willfully ignorant and purposefully refrained from seek-

ing information with regard to Strother's acts. Even after Mickler met with Hamilton on June 6, 1979 regarding the January 31 note and was advised of his obligation, there is no evidence that Mickler disaffirmed Strother's acts or that he took any affirmative action to resolve the problems. Rather, the evidence reveals that Hamilton wrote to Mickler on June 8, 1979, confirmed their meeting and proposed a schedule for payment under the note (Pl's Exh. No. 8). Mickler testified that he received additional letters from Hamilton regarding the $400,000 debt, but did not respond to the letters. Rather, he simply turned them over to McClain. Mickler also testified that he was not aware of any written response by McClain.

Based on the foregoing, the Court is satisfied that under the particular facts of this case, Mickler ratified Strother's acts by willful ignorance and silence, that the payments to Strothers were, in effect, payments to Mickler and the defense of the total failure of consideration is without merit. Accordingly, Count II of the Amended Complaint shall be dismissed.

This leaves for consideration the counterclaim for damages for failure to pay the note and the defense of criminal usury.

Having determined that Mickler executed the package of documents dated January 31, 1979; that Strother, by way of ratification, was Mickler's agent; and that Mickler via Strother constructively received funds from Kreimer and Maranatha, it is clear that unless Mickler prevails on the defense of criminal usury, he is obligated, at least to some extent, under the note.

▋ There is no doubt that usury statutes are enacted to protect the necessitious borrower from the avaricious demands of lenders. *Pushee v. Johnson*, 123 Fla. 305, 166 So. 847 (1936). Section 687.071 Fla. Stat. (1977) provides in pertinent part:

§ 687.071. Criminal Usury, Loan sharking; shylocking

(3) Unless otherwise specifically allowed by law, any person making an extension of credit to any person, who shall willfully and knowingly charge, take or receive

interest thereon at a rate exceeding forty-five percent per annum or the equivalent rate for a longer or shorter period of time, whether directly or indirectly or conspire to do so, shall be guilty of a felony of the third degree, punishable as provided in s. 775.082, s. 775.083 or s. 775.084.

\*    \*    \*    \*    \*    \*

(7) No extension of credit made in violation of any of the provisions of this section shall be an enforceable debt.

An "extension of credit" for purposes of § 687.07 Fla.Stat. "... means to make or renew a loan of money or any agreement for forbearance to enforce the collection of such loan." § 687.071(1)(d) Fla.Stat. (1977).

In determining whether a particular transaction is usurious, Florida Courts have developed a four-prong test: (1) there must be a loan, expressed or implied; (2) an understanding between the parties that the money loaned shall be returned; (3) it must appear that a greater rate of interest than is allowed by law was agreed to be paid; and (4) a corrupt intent to exact more than the legal rate of interest must be present. *Sharp v. Dixon*, 252 So.2d 805 (Fla. 4th DCA 1971).

▋ Usury is largely a matter of intent. *Chandler v. Kendrick*, 108 Fla. 450, 146 So. 551 (1933). It is clear, and the cases so hold, that a mathematical computation, standing alone, is not sufficient to demonstrate corrupt intent. *Sharp v. Dixon*, 252 So.2d 805 (Fla. 4th DCA 1971). The borrower has the burden to show an intent to charge interest in excess of the rate permitted by law. *American Acceptance Corp. v. Schoenthaler*, 391 F.2d 64 (5th Cir.1968) cert. denied, 392 U.S. 928, 88 S.Ct. 2287, 20 L.Ed.2d 1387 (1968). In Florida, the element of intent is analyzed basically on the basis of good faith. Usury may be inferred from the circumstances, *Mitchell v. Doggett*, 1 Fla. 356 (1847), *Sharp v. Dixon, supra* at 807, and the Court, in making its determination, may consider other instruments executed as

part of the same transaction. *Conner Air Lines, Inc. v. Aviation Credit Corp.*, 280 F.2d 895 (5th Cir.1960).

■ In determining whether a transaction is usurious, the amount of a "bonus" exacted in connection with the financing may be regarded as interest. *Conner Air Lines v. Aviation Credit, supra.* For example, if the borrower is obligated to pay a bonus for a loan, the transaction may be usurious *if* the amount of the bonus or the amount of the bonus plus interest exceeds the lawful rate. *Tucker v. Fouts*, 73 Fla. 1215, 76 So. 130 (1917).

■ It is well settled that a borrower may agree to pay actual and necessary expenses of making a loan, *Financial Federal Savings and Loan Assn. v. Burleigh House, Inc.*, 305 So.2d 59 (Fla. 3d DCA 1974). It is also recognized, however, that a "purported" fee or charge for services not actually rendered, shall not be permitted to cloak the extraction of illegal interest. *Williamson v. Clark*, 120 So.2d 637 (Fla. 2d DCA 1960).

■ Finally, where it is found that a lender has intentionally and purposely done that which results in a contract fraught with usury, the lender cannot rest on the argument that the borrower has failed to show the lender's intent to violate the statute. *Curtiss National Bank of Miami Springs v. Solomon*, 243 So.2d 475 (Fla. 3d DCA 1971). Of course, ignorance of the law is no defense, *Ross v. Whitman*, 181 So.2d 701 (Fla. 3d DCA 1966), nor can a lender claim that he acted upon advice of counsel. *Carr v. Cole*, 119 Fla. 260, 161 So. 392 (1935).

■ Applying the foregoing legal principles to the facts as set forth above, this Court is satisfied that the transaction between Maranatha and Kreimer, as lenders and Mickler, via Strother, as borrower, is violative of § 687.071 Fla.Stat. (1977) inasmuch as the interest sought to be charged directly and indirectly exceeds 45% per annum.

■ As noted earlier, the promissory note executed on January 31, 1979 provides for 12% interest which exceeds the applicable statutory rate by 2% per annum. Of course, scienter is as much an element of civil usury as in criminal usury, *First Mortgage Corp. of Vero Beach v. Stellmon*, 170 So.2d 302 (Fla. 2d DCA 1964) *cert. denied*, 174 So.2d 32 (Fla.1965), and if the contract on its very face imports usury, by express reservation, the intent is apparent. *Atwood v. Fisher*, 330 So.2d 62 (Fla. 3d DCA 1976). Thus, it is possible to conclude that the intent to exact a usurious interest rate is satisfied by the mere fact that the note provides for a 12% rate.

Assuming, but not admitting, that a higher standard is required to establish criminal usury, this Court is satisfied that an examination of the documents and the attendant circumstances satisfies the requirement.

■ The January 31, 1979 package includes a promissory note for $400,000 which states in pertinent part:

> "The amount of Four Hundred Thousand & no/100 ($400,000) Dollars has been advanced to the makers as follows: One Hundred Thousand & no/100 ($100,000) Dollars has been advanced by Maranatha Realty Associates, Inc. on July 15, 1978 ... interest has accrued from July 15, 1978 ..."

The record is clear that as of July 31, 1978, Strother had received $18,000. The sum of $10,000 was withheld as interest, and a $20,000 commission was withheld for the placement of a loan which never transpired. On July 26, 1978, Strother received $12,000 and on July 28, 1978, Strother received $40,000.

The note further provides:

> ... another One Hundred Thousand & no/100 Dollars has been advanced by Stanley E. Kreimer and interest on this amount shall accrue from the date of this note ...

Again, the record is clear that Strother received $17,000 on February 1, 1979; $10,000 on February 8, 1979; $7,500 on Febru-

ary 12, 1979; $36,000 on February 15, 1979; and $5,000 on March 5, 1979. Kreimer withheld $5,000 interest, $5,000 was paid to Maranatha for placing the Kreimer loan; and $9,500 was reserved for legal fees and expenses. The timing of the disbursements alone increased the interest rate beyond the stated 12%, since it is evident that a delay in transferring proceeds materially increases interest rates, *Williamson v. Clark*, 120 So.2d 637 (Fla. 2d DCA 1960). In addition, the note provides:

> The remaining Two Hundred Thousand and no/100 ($200,000) Dollars which comprises the Four Hundred Thousand & no/100 ($400,000) Dollars is the value of services previously rendered by the payees for the benefit of the Makers.

Of course, this provision refers to the commissions claimed to be earned by Maranatha and Kreimer in connection with the Bank and Tri-State construction loans, which never materialized. Without belaboring this point, the Court is satisfied that these amounts do not constitute "earned" commissions and Maranatha did little more than introduce a prospective lender to a prospective borrower. With respect to Kreimer, there is no doubt that he was not even involved in any negotiations concerning these "loans." In short, these "commissions" were nothing more than disguised intent to increase the return on a "risk" investment.

Next, Mickler executed 25 year Agreements which were to produce an income stream to Kreimer in the total amount $500,000, and to Maranatha in the amount of $500,000. As to Kreimer, the agreement recognized that it was executed "in consideration of the loan previously made ... and in consideration of the numerous hours of service and advise extended by Stanley E. Kreimer ..." It is clear that at best, Kreimer could have advised and served no more than one month at the time this agreement was executed. Further, by his admission, Kreimer was expected to render no significant services over the course of the agreement. This is nothing more than an additional "bonus" for lending "seed money."

While the Maranatha agreement purports to provide for certain specified consulting services over the term, the Court is satisfied that this too was a bonus merely disguised as a consulting agreement. It should be noted that payments under both agreements became due and payable on December 1, 1979 even if the shopping center did not open for business.

As noted, the package of January 31 also included the option described earlier and the Defendants agreed to forebear from exercising the option for additional compensation with no reduction to principal.

Based on the foregoing, this Court is satisfied that when considering all of the elements involved there is an overriding scheme to exact an outrageous return on sums advanced, which scheme was knowingly and intentionally devised.

Accordingly, this Court concludes that the debt is unenforceable and the claims asserted by Stanley E. Kreimer and Maranatha must be disallowed.

A separate final judgment will be entered in accordance with the foregoing.