In the Matter of OFFSHORE DEVELOP-
MENT CORP., Debtor.

BEAUSEJOUR CORPORATION,
Plaintiff,

v.

OFFSHORE DEVELOPMENT
CORP., Defendant.

Bankruptcy No. 83–14.
Adv. No. 83–442.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Jan. 23, 1984.

Richard C. Prosser, Tampa, Fla., for debtor/defendant.

Hywel Leonard, Tampa, Fla., for plaintiff.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

THIS IS an adversary proceeding and the matter under consideration is a Complaint filed by Beausejour Corporation (Beausejour) against Offshore Development Corp. (Offshore), the Debtor in a Chapter 11 case presently pending before this Court. The Complaint sounds in two counts: Count I is an action for declaratory relief, pursuant to 28 U.S.C. § 2201, which seeks a declaration that the transaction entered into between Offshore and Beausejour was a bona fide sale and not a usurious financing transaction as defined by Florida law. Count II is also an action for declaratory relief and seeks a declaration, in the event this Court determines the instant transaction to be criminally usurious, that the transaction was purged from the taint of usury by notice sent by Beausejour in compliance with Fla.Stat. § 687.04(2).

Offshore filed a counterclaim and in Count I seeks a declaratory judgment finding the transaction with Beausejour to be criminally usurious and, therefore, an unenforceable obligation pursuant to Fla.Stat. § 687.071(7) which cannot be purged by sending a notice pursuant to Fla.Stat. § 687.04(2). In Count II, Offshore seeks a turnover of the sum of $250,000 which it paid to Beausejour in connection with the transaction.

The facts relevant to the issues under consideration as established at the trial can be summarized as follows:

Offshore is a Florida corporation which presently owns a 13 acre tract of land located in Clearwater, Florida, commonly known as the Duhme Road Project. This property was acquired for the purpose of building condominium units to be known as 5,000 Island Place. Michael Sedwick is president of Offshore. Beausejour is a Netherland Antilles corporation doing business in the State of Florida and presently managed by a director, Michael Brassuer, a French na-

tional. A managing director under the laws of Netherland Antilles is the equivalent of a president of a domestic corporation. It appears that Brassuer was extensively involved in various projects in the United States representing European investors.

On November 22, 1980, Sedwick and one James A. Connell entered into an Agreement for Purchase and Sale of Real Estate whereby Sedwick and Connell agreed to purchase the Duhme Road Project from Sunland Properties (Sunland), for $728,000. This Agreement for Sale reflected the buyers to be "Michael Sedwick, James A. Connell and/or assigns." The language "and/or assigns" was added to protect the anticipated assignment of this contract to a corporation which was to be formed by Sedwick for the purpose of taking title to the Duhme Road Property. Pursuant to the terms of the Agreement for Sale, Sedwick paid $10,000 as an earnest money deposit and agreed to execute a note and a purchase money mortgage in the amount of $500,000, bearing an annual rate of interest at 12½%. The balance of the purchase price was due at closing. At the time the property was purchased from Sunland, Sedwick had already discussed with Brassuer the financing of this purchase and it agreed to provide the acquisition loan. It appears that Sedwick has been involved in two previous transactions in which Brassuer arranged for the funds needed for the acquisition of other properties.

The two earlier transactions involved projects known as Camelot Oaks and Gulf Beach, both of which were handled essentially in the same way and followed the following scenario. Brassuer and his attorney, Mr. Elliott Burko, formed a new entity which would loan money to a corporation formed by Mr. Sedwick which would take title to the property in question. Thereafter, Sedwick's corporation would execute a mortgage in favor of the corporation formed by Brassuer for twice the amount of monies advanced. For example, if the corporation formed by Brassuer advanced $500,000 to Sedwick's corporation, a mortgage would be recorded in the amount of $1,000,000. Although a mortgage was always recorded for the amount advanced, Sedwick did not know exactly how the transaction would be structured since he never saw the actual documents of transfer until the time of closing. The drafting of the documents was always the responsibility of Mr. Burko.

After the execution of the Agreement for Sale and Purchase and prior to the closing of the Duhme Road transaction on December 19, 1980, Sedwick met with Brassuer and Burko and discussed with them the problem of possible usury in connection with the proposed transaction because of the execution of a mortgage for twice the amount of the loan for the Duhme Road project. Burko assured Sedwick that the transaction could be structured in a fashion which would effectively avoid the appearance of usury. During this same time interval, Mr. Burko formed Beausejour which was to act as the lender in the Duhme Road transaction. At the time of the corporation's formation and the real estate closing, Mr. Burko was both the managing director and the attorney for the corporation. Simultaneously, Mr. Sedwick formed Offshore Development Corporation for the purpose of taking title to the property. At closing, Mr. Burko, utilizing the staff of Lawyers' Land Title Corporation, prepared several documents.

First, Sedwick and Connell executed an Assignment of the Agreement for Sale and Purchase of Real Estate to Beausejour. Parenthetically, it is interesting to note that the Assignment was not to Sedwick's corporation, i.e. Offshore, as originally anticipated by Sedwick, but rather to Beausejour. Sunland then executed a Warranty Deed to Beausejour. Although this Warranty Deed reflects a date of December 18, 1980, Sedwick testified that this document was, in fact, prepared on December 19, 1980 in conjunction with the other closing documents. In fact, it was witnessed and notarized by the same witnesses and notary whose names appear on the other closing documents. Next, Beausejour, as seller, and Offshore, as buyer, entered into an

Agreement for Purchase and Sale whereby Beausejour agreed to convey to Offshore all of its right, title and interest in the Duhme Road property for the sum of $1,000,000. Beausejour then executed a warranty deed conveying the property to Offshore and a Mortgage and Note was executed by Offshore in favor of Beausejour in the sum of $1,000,000. In addition, Offshore executed a Mortgage Deed in favor of Sunland and W.J. White. At the same time, Offshore executed two promissory notes for $250,000 each in favor of Sunland and W.J. White. Mr. White's relationship to Sunland, if any, was not revealed at trial. In any event, it is clear that the Mortgage Deed and Promissory Notes totalling $500,000 in favor of Sunland and White represented a purchase money mortgage on the property. At this juncture, it must be noted that, although Sedwick and Connell assigned the Agreement for Sale and Purchase of Real Estate to Beausejour and, thereafter, Sunland conveyed by warranty deed to Beausejour, Offshore executed the purchase money mortgage in the amount of $500,000 and not Beausejour as one might expect.

Under the terms of the Agreement for Purchase and Sale between Beausejour, as seller, and Offshore, as buyer, the Mortgage Note executed by Offshore in the face amount of $1 million became due on December 19, 1981. During the one year period between the date of execution and the due date, the note was to be interest free. The Agreement further provided that in the event Offshore did not make the $1,000,000 payment by December 19, 1981, the principal sum was to be increased by $20,834 for each 30 day period after the due date. It is without dispute that the note was not paid on December 19, 1981, although Offshore paid to Beausejour the sum of $250,000 on or about December 28, 1981.

Almost two years after the date of closing and approximately one year after receiving the $250,000 payment, Beausejour sent a letter dated September 15, 1982 to Offshore which provided in pertinent part:

"Please be advised that Beausejour will accept, in full satisfaction of the obligations of Offshore to Beausejour under the note and mortgage, the sum equal to all amounts advanced or paid by Beausejour to, or at the direction of, Sunland, Sedwick, Connell, Offshore or any entity or individual controlled by or affiliated with Offshore or its principals, together with interest on all such advances or payments from the date of said advances or payments to the date of repayment at the rate of 18% per annum, less any prior credits, adjustments or repayments.

Except as modified above, the Note and Mortgage shall remain in full force and effect."

Beausejour asserts that the preceding portion of this letter purged the transaction of the taint of criminal usury if there was one and the letter satisfied the notice provision of Fla.Stat. 687.04(2).

It is apparent from the foregoing that the initial inquiry must be addressed to the true nature of the transaction, whether it was a bona fide sale or a loan.

Beausejour contends that the transaction under consideration was an outright sale and not a loan to Beausejour. The relevant statute under the present circumstances is Fla.Stat. § 697.01 (1981) which states as follows:

§ 697.01

(1) All conveyances, obligations conditioned or defeasible, bills of sale or after instruments of writing, conveying or selling property, either real or personal, for the purpose or with the intention of securing the payment of money, whether such instrument be from the debtor to the creditor, or from the debtor to some third person in trust for the creditor, shall be deemed and held mortgages, and shall be subject to the same rules of foreclosure and to the same regulations, restraints and forms as are prescribed in relation to mortgages.

In determining whether a transaction is a loan as opposed to a sale, the mere form of the agreement is not controlling; for only by examining the substance of the transaction, together with the surrounding circumstances, is it possible to ascertain the

exact nature of the transaction. *Kay v. Amendola,* 129 So.2d 170 (Fla. 2d DCA 1961). The Court will look beyond the terms of the documents themselves in order to determine the real intent of the parties. *McLendon v. Davis,* 131 So.2d 765, 767 (Fla. 3rd DCA 1961). For example, where a loan was disguised as a sale re-purchase, courts traditionally look to other factors, such as, the time interval between execution of the sale and re-purchase documents and the economic loss which would result to the borrower if he did not re-purchase. Similarly, the courts will find a loan where the "investors" are guaranteed a profit in excess of the maximum rate of interest and where the investment is essentially without risk to the "investors." *Griffin v. Kelly,* 92 So.2d 515 (Fla.1957).

█ It is obvious from the facts adduced at trial that the transactions were really designed by Beausejour to loan Offshore $500,000 to enable Offshore to buy the Duhme Road property. In exchange for the loan, Offshore gave Beausejour a mortgage note in the amount of $1 million.

After finding that the transaction was a loan, the next issue to be decided is whether the particular transaction is criminally usurious. In regards to the issue of usury, the applicable statute is Fla.Stat. § 687.071 which provides in pertinent part as follows:

§ 687.071 Criminal usury, loan sharking, shylocking

(3) Unless otherwise specifically allowed by law, any person making an extension of credit to any person, who shall willfully and knowingly charge, take or receive interest thereon at a rate exceeding 45% per annum or the equivalent rate for a longer or shorter period of time, *whether directly or indirectly* or conspire to do so, shall be guilty of a felony . . .

(7) No extension of credit made in violation of any of the provisions *of this Section* shall be an enforceable *debt* in the courts of this state." (emphasis supplied)

█ In determining whether a particular transaction is usurious, Florida courts have developed a four-prong test: (1) there must be a loan, expressed or implied; (2) an understanding between the parties that money loaned shall be returned; (3) it must appear that a greater rate of interest than is allowed by law was agreed to be paid; and (4) a corrupt intent to exact more than the legal rate of interest must be present. *Sharp v. Dixon,* 252 So.2d 805 (Fla. 4th DCA 1971).

█ With respect to the issue of intent, it is clear that a mathematical computation, standing alone, is not sufficient to demonstrate corrupt intent. *Dixon, supra.* Rather, the borrower must show that the lender intended to charge interest in excess of the statutory maximum. *American Acceptance Corp. v. Schoenthaler,* 391 F.2d 64 (5th Cir. 1968), cert. denied, 392 U.S. 928, 88 S.Ct. 2287, 20 L.Ed.2d 1387 (1968). However, it is not sufficient to prove lack of intent for the lender to simply state that he relied on the advice of counsel. *River Hills, Inc. v. Edwards,* 190 S.2d 415 (Fla. 2d DCA 1966). If, however, the lender can prove that the interest was exacted through inadvertent error, the element of intent is lacking. *Connecticut Mutual Life Insurance Co. v. Fisher,* 165 So.2d 182 (Fla. 3rd DCA 1964). Essentially, Florida analyzes the element of intent on the basis of good faith. *Dixon, supra.* It is also clear that evidence of other loan agreements involving the lender may be used by the borrower to prove the requisite intent. See, *River Hills, supra* and *Continental Mortgage Investors v. Village By the Sea,* 252 So.2d 833 (Fla. 4th DCA 1971).

█ Applying the foregoing legal principles to the facts of the case at bar, this Court is satisfied that the instant transaction was a thinly-veiled attempt to camouflage a criminally usurious loan transaction as a sale and that Beausejour corruptly intended to do so. Indeed, this conclusion is inevitable in light of the fact that, with the exception of the Sedwick and Connell Agreement to Purchase, all of the documents were prepared and executed at the time of closing. Second, it is clear that the principals of Beausejour were also involved in two other transactions involving the

same pattern of conduct whereby the lender recorded a mortgage for twice the amount advanced thereby guaranteeing its profit and removing any element of risk from the transaction. Having heard the testimony of the witnesses and having observed their demeanor, this Court also finds that Sedwick, Brassuer and Burko contrived to avoid the appearance of usury by disguising the transaction as a sale. Indeed, Brassuer testified that he was putting in $500,000 and that he wanted to receive double that amount at the end of one year.

■ Having decided that the loan was in excess of the 45% maximum allowed by law and, therefore, criminally usurious, this Court must now determine whether Beausejour purged the transaction of criminal usury by sending a notice pursuant to Fla. Stat. § 687.04. This Section provides, in pertinent part, as follows:

§ 687.04. Penalty for Usury: Not to Apply in Certain Situations

Any person, or an agent, officer or other representative of any person, willfully violating the provisions of s.687.03 shall forfeit the entire interest so charged, or contracted to be charged or reserved, and only the actual principal sum of such usurious contract can be enforced in any Court in this state, either at law or in equity; and once said usurious interest is taken or reserved, or has been paid, then and in that event the person who has taken or reserved, or has been paid, either directly or indirectly, such usurious interest shall forfeit to the party from whom such usurious interest has been reserved, taken, or exacted in any way double the amount of interest so reserved, taken or exacted. However, the penalties provided for by this section shall not apply; (2) If prior to the institution of an action by the borrower or the filing of a defense under this chapter by the borrower or receipt of written notice by the lender from the borrower that usury has been charged or collected, the lender notifies the borrower of the usurious overcharge and refunds the amount of any overcharge taken, plus interest on the over-

charge taken at the maximum lawful rate in effect at the time the usurious interest was taken, to the borrower and makes whatever adjustments in the appropriate contract or account as are necessary to ensure that the borrower will not be required to pay further interest in excess of the amount permitted by s.687.-03.

Whether the purging provisions set forth in § 687.04(2) above apply to transactions which are criminally usurious has not been answered by the courts of this state and, therefore, this is a case of first impression. The first sentence of § 687.04 indicates that a forfeiture of interest will occur if the provisions of § 687.03 are violated. The difficulty arises because § 687.03(1) provides in, pertinent part, as follows:

"However, if any loan, advance of money, line of credit, forbearance to enforce the collection of a debt, or obligations exceed $500,000 in amount of value, it shall not be usury or unlawful to reserve, charge or take interest thereon unless the rate of interest exceeds the rate prescribed in s.687.071."

Thus, it can be argued that this reference to the criminal section is an incorporation by reference and would, therefore, permit a purge of criminal usury. In addition, subsection (3) of § 687.071 contains the phrase, "unless otherwise specifically allowed by law." One court has reasoned that this language signifies that the provisions of § 687.071 must be read in conjunction with all provisions of Chapter 687 F.S.A. so that the statute can be construed as meaningful in all of its parts. *Wilensky v. Fields,* 267 So.2d 1 (Fla.1972) (see also, Justice Deekel's dissent in this case). In the event the reasoning set forth in *Wilensky, supra* were applicable, it could be argued that the language of Fla.Stat. § 687.071(7) which states that "no extension of credit made in violation of any provisions of this section shall be enforceable *debt* in the courts of this state," (emphasis supplied) is at odds with the curing provisions set forth in § 687.-04(2). However, this Court finds that the principles of meaningfulness and harmony

set forth in *Wilsenky, supra* can only be fostered by concluding that the civil purging provision set forth in § 687.04(2) does not apply to instances of criminal usury. As the court noted in *Wilsenky, supra,* subsection 7 of § 687.071, by its express terms, specifically applies to violations of the provisions of § 687.071 which constitute criminal usury. In addition, that court highlighted that "687.071 was enacted to provide criminal penalties where extensions of credit were made in violation of *that* section." *Wilsensky, supra* at page 5.

At the trial in this matter, the testimony of the Speaker of the Florida House, the Honorable Lee Moffitt, was proffered for the purpose of demonstrating that the civil purging provision should apply to transactions which were criminally usurious. However, upon cross examination, Mr. Moffitt testified that the application of the civil purging provision to the earlier enacted criminal penalties was not discussed by the legislature. In addition, in the Partial Transcript of Hearing before Florida House Sub-Committee on Commerce, Chairman Moffitt, in discussing the purging provision stated: "[I]n other words if it is a *good faith* mistake they ought not to be penalized . . ." Moreover, the Staff Summary and Analysis dated February 20, 1979, stated, "It is the intent of this proposed legislation to create a *"good faith" type of defense for lenders who discover their error and rectify it.*

In addition, the CLE manual entitled, *Practice Under Florida Usury Law,* at section 2.9 (August 1980), provides at page 32:

> *An important limitation on F.S. § 687.-04(2) however, must be noted. That law does not apply to criminally usurious transactions. This fact must be born in mind particularly by lenders who are lending more than $500,000 at rates close to the criminal usury ceiling.*

Finally, there is a more telling reason why the civil purging provision cannot apply to the criminal penalties, including unenforceability of the debt, set forth in § 687.071 et seq. It can best be illustrated by the following scenario: Assume that a lender is indicted and arrested for exacting interest in excess of 45% on a loan for more than $500,000. Under § 687.071(3), his conduct would constitute a felony in the third degree. Assume further that he had not been notified by the borrower of the usurious overcharge and that the borrower had not instituted an action against the lender or filed a defense. If the civil purging provision applies, the lender may write a letter from his jail cell notifying the borrower of the usurious overcharge, refunding the overcharge taken, plus interest on the overcharge, and making whatever adjustments in the appropriate contract or account are necessary to ensure that the borrower will not be required to pay further interest in excess of the maximum amount. Thus, the lender would purge the taint of criminal usury from the transaction, be released from jail and continue to receive payments on the loan plus interest at the maximum allowable rate. Clearly, in enacting § 687.04(2), the legislature did not intend for the lender to hold the key to the jail cell. It only intended a "good faith" defense. Thus, subsection 7 specifically makes a violation of the provisions of § 687.071 an unenforceable *debt* in the courts of this state.

Even assuming, for the sake of argument, that Beausejour is correct in its assertion, it is clear that Beausejour failed to comply with the notice provisions set forth in § 687.04(2). As mentioned above, the notice of the lender must: (1) notify the borrower of the usurious overcharge; (2) refund the amount of any overcharge taken, plus interest on the overcharge taken at the maximum lawful rate in effect at the time the usurious interest was taken; and (3) make whatever adjustments in the appropriate contract or account as are necessary to insure that the borrower will not be required to pay further interest in excess of the amount permitted by § 687.03. The November 15 letter sent by Beausejour to Offshore does not comply with this section for several reasons. First, nowhere does the letter recite that there has been a usurious overcharge. It is only by implication

that this notification can be gleaned from the letter. In addition, a careful reading of the letter reveals that it proposed to modify the original note and mortgage by accepting "a sum equal to all amounts advanced ..., together with interest on all such advances or payments *from the date of such advances or payments* to the date of repayment at the rate of 18% per annum ..." Clearly, the exaction of 18% interest from the date of advances or payments is at odds with the original Note and Mortgage which provided that the loan was to be interest free during the first year. Moreover, the letter failed to state or refund the overcharge which necessarily would have resulted from pro rating the $20,834 increase in the principal sum since the loan was not paid off on the original due date. Stated another way, Beausejour should have refunded a portion of the $250,000 paid on December 28, 1981. This amount would be determined by subtracting from the $250,000 payment the amount derived by dividing $20,834 by the number of days in the month times the number of days the loan was overdue. Finally, it is clear that no formal adjustments were ever made to the appropriate contracts to ensure that the borrower would not be required to pay any further interest above the statutory maximum.

Based upon the foregoing, it is clear that the transaction is criminally usurious and, therefore, the debt is unenforceable. Accordingly, Offshore is entitled to a judgment against Beausejour in the amount of $250,000 plus the maximum amount of interest as allowed by law.

A separate final judgment will be entered in accordance with the foregoing.