**In re DIAGNOSTIC INSTRUMENT GROUP, INC., Nelson H. Tobin, Debtors.**

**Official Committee of Unsecured Creditors by and Through Michael C. Markham, Committee Designee Under the Confirmed Plan, Plaintiff,**

**v.**

**Hilary Jon Lerner, et al., Defendants.**

**Bankruptcy No. 01–00273–8W1. Adversary No. 01–591.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

April 19, 2002.

Michael C. Markham, Johnson, Blakely, Pope, Bokor, Ruppel & Burns, P.A., Clearwater, FL, for Official Committee of Unsecured Creditors.

Carrie Beth Baris, Jeffrey W. Warren, Bush, Ross, Gardner, Warren & Rudy, P.A., Tampa, FL, for Hilary Jon Lerner.

Stephen R. Leslie, Harley E. Riedel, II, Stichter, Riedel, Blain & Prosser, P.A., Tampa, FL, for Debtors.

*Memorandum Decision and Order on Cross–Motions for Summary Judgment with Respect to Count I of the Complaint (Hilary Jon Lerner)*

MICHAEL G. WILLIAMSON, Bankruptcy Judge.

This adversary proceeding came on for hearing on April 4, 2002 ("Hearing"), on a motion for summary judgment ("Committee Motion")(Doc. No. 164) filed by the Official Committee of Unsecured Creditors ("Committee") of Diagnostic Instrument Group, Inc. ("Diagnostic") and on a motion for summary judgment ("Lerner Motion")(Doc. No. 181) filed by defendant Hilary Jon Lerner ("Dr. Lerner"). The Committee Motion and the Lerner Motion are cross-motions for summary judgment addressing the "ordinary course of business" defense asserted by Dr. Lerner with respect to Count I of the complaint, which seeks avoidance under Bankruptcy Code section 547 of alleged preferential transfers made by Diagnostic to Dr. Lerner.

*Procedural Posture of Case*

Diagnostic filed its petition under chapter 11 on January 5, 2001. On March 1, 2001, the Office of the United States Trustee appointed the Committee. On June 11, 2001, this Court entered an order

confirming the Debtor's plan of reorganization ("Plan"). The Plan provides for the appointment of a designee ("Designee") to, *inter alia*, pursue preference actions for the benefit of the Debtor's unsecured creditors. On August 15, 2001, the Designee commenced this action seeking recovery of alleged preferential transfers made by the Debtor to Dr. Lerner.

### Findings of Fact

Diagnostic is in the business of refurbishing and selling used ophthalmic equipment to eye care professionals, including ophthalmologists. In furtherance of this business, Diagnostic's principal, Nelson Tobin ("Tobin"), regularly attends the annual trade convention of the American Academy of Ophthalmologists held in late October of each year.

As the October 2000 convention approached, Diagnostic was in need of cash to purchase some used equipment to be refurbished and then marketed from its booth at the convention. However, Diagnostic had no further availability under its line of credit with its bank. Tobin mentioned this need for a short-term loan ("Loan") to a long-time personal friend and customer, Dr. Lerner.[1]

Dr. Lerner is an ophthalmologist with 20 years' experience practicing in California. His undergraduate degree is in psychology. He has no formal business training, and (other than one real estate investment in which he purchased and resold an undeveloped property for investment purposes) he has never been involved in any business activity other than relating to his medical practice. Lerner Dep. at 7.

Coincidentally, Dr. Lerner was holding some cash that he had recently obtained from his bank for the purchase of new

laser equipment from another equipment vendor. Because Diagnostic needed only a short-term loan and the payment for the new laser equipment was not due until after the Loan would be repaid, this presented a business opportunity for Dr. Lerner, which resulted in the Loan to Diagnostic.

The terms of the Loan are memorialized in a memo from Tobin to Dr. Lerner dated October 17, 2000, on Diagnostic's letterhead ("Memo"). It reads as follows:

\* \* \* \* \* \*

#### MEMO

To: Hillary [sic]

From: Nelson

Date: October 17, 2000

Re: Our Agreement

This will confirm our agreement that I agree that in return for a short-term loan of $250,000 I will repay you $275,000 which will be a combination of the principal, interest at 12% and the balance as a consulting fee.

Payment will be made on or before December 15, 2000.

\* \* \* \* \* \*

Exhibit "B" to Lerner Dep.

Although the Memo accurately reflects the transaction, Diagnostic's chief financial officer, at Tobin's request, also prepared a promissory note dated October 20, 2000 ("Note"). Exhibit "A" to Lerner Dep. The Note was executed by Diagnostic on October 17, 2000, the same day as the Memo was prepared and sent. Tobin also executed the Note, individually, as a guarantor. It should be noted that the Loan violated the terms of Diagnostic's line of credit

---

1. Deposition of Nelson Tobin taken March 27, 2002 ("Tobin Dep."), at 9–10; Deposition of Hilary Jon Lerner taken April 1, 2002 ("Lerner Dep."), at 18–19.

agreement with its bank. Lerner Dep. at 37–38.

The Note contains typical additional terms commonly found in promissory notes; however, it varies materially from the Memo in one significant respect: there is no reference to the "consulting fee" or the actual payoff amount of $275,000. Rather, the Note by its terms simply provides for payment of the principal of $250,000 plus interest of 12 percent per annum. Importantly, it is without dispute that the Memo, rather than the Note, accurately reflects the terms of the Loan made by Dr. Lerner to Diagnostic. Tobin Dep. at 16.

While Dr. Lerner and Diagnostic (through Tobin) had been party to between "10 and 50" previous purchases of ophthalmic equipment, Lerner Dep. at 8, these involved sales of "a couple of hundred thousand" dollars worth of refurbished equipment by Diagnostic to Dr. Lerner. Tobin Dep. at 7. This was their first and only loan transaction. In fact, even though Dr. Lerner deals with other equipment dealers, he has never loaned them any money. Likewise, he has never been the payee under a promissory note or loaned anyone any money. Lerner Dep. at 13, 29. Additionally, it was also the largest loan ever made to Diagnostic by an individual. Tobin Dep. at 13.

Diagnostic had entered into previous transactions with other individuals to obtain funds to buy equipment. However, these other transactions were not structured as loans. Tobin Dep. at 26. Rather, they were structured as investments. As termed by Tobin, "They would help me buy equipment, and for that they would get a piece of the action." *Id.* With one exception, the other transactions were not memorialized in written documents. *Id.* at 25–26.

There is no evidence to support the contention that Dr. Lerner ever provided consulting services to justify payment of a "consulting fee" as contemplated by the Memo. All that Dr. Lerner and Tobin can point to regarding Dr. Lerner's consultations are discussions that occurred in the normal course of sale/purchase transactions with respect to the merits of particular types of equipment. Lerner Dep. at 13. However, these discussions occurred over the entire five-year term of their relationship. Lerner Dep. at 14. Dr. Lerner admits that these "consulting services" have always been of "a very informal nature." Lerner Dep. at 36. "It's a give and take I have with Mr. Tobin. . . . We do not have any specific written agreement that is ongoing." Lerner Dep. at 36. The only discussion about paying Dr. Lerner for these consulting services was in connection with the Loan. Lerner Dep. at 13.

Dr. Lerner states that he also acts as a consultant on a "casual basis" for other companies he deals with in the eye equipment industry. However, he has never been paid for this "consulting" either. Lerner Dep. at 14. Tobin was clear that other than serving as an informal reference, Dr. Lerner never provided any services in exchange for the consulting fee that is contemplated by the Memo. Tobin Dep. at 16.

Dr. Lerner's deposition testimony provides no support for his contention that "consulting services" were actually contemplated or provided with respect to the Loan:

Q Did you perform any specific consulting . . . in connection with the October 17 memo?

A Well, that's a difficult question to answer because, since Mr. Tobin and I have discussed, upon occasion, various aspects of the benefits of ophthalmic equipment without being specific as to

whether it was a consultation regarding this memo or not, I don't know.

I don't have an answer to that question. I have—my consultation with Mr. Tobin is kind of an ongoing thing. What of that consultation refers to this memo and what does not, I don't know.

Q Does the consulting fee referenced in the October 17 memo refer to consulting services already performed?

A I don't know the answer to that.

Q So you don't know whether the consulting fee in the memo relates to consulting fees already performed or consulting to be performed in the future?

A That is correct.

Q Now, because that was never discussed specifically with Mr. Tobin?

A Yes. That's right.

Lerner Dep. at 15–16.

The $275,000 that was owed to Dr. Lerner was not paid on its due date of Friday, December 15, 2000. Instead, Tobin, without consulting with Dr. Lerner, wire transferred $50,000 to Dr. Lerner's brokerage account on Monday, December 18, 2000. Upon learning that only $50,000 had been received, Dr. Lerner called Tobin to find out why the balance due had not been paid in full. Lerner Dep. at 23; Tobin Dep. at 20. From Dr. Lerner's perspective, payment was important as he had a bill coming due with respect to the purchase of his new laser equipment. As explained by Tobin with respect to Diagnostic's failure to pay the Loan when due, "I didn't have the cash-flow." Tobin Dep. at 19.

As further explained by Tobin, "It was, 'Hilary, as cash flow allows, I will pay you.' I looked at how much I had in the bank and if I had an extra 50, I gave it to him. I would get a daily financial float report of what I had available to spend. What I had I was paying him back." *Id.* at 20. Dr.

Lerner orally agreed to Diagnostic's making partial payments over a period of a number of days. Lerner Dep. at 21. There was no specific date by which the Loan would be paid in full. Lerner Dep. at 22. Rather, Dr. Lerner was "under the impression that I would be paid over a period of days and it would not be a long time." Lerner Dep. at 22.

The following payments were made by Diagnostic to Dr. Lerner with respect to the Loan ("Payments"):

| | |
|---|---|
| December 18, 2000 | $50,000 |
| December 19, 2000 | $50,000 |
| December 20, 2000 | $50,000 |
| December 26, 2000 | $25,000 |

Other than payments to the bank through Diagnostic's sweep account with respect to its line of credit, it appears that Dr. Lerner was the only creditor that was receiving daily payments during this period up until the bank called its line of credit on December 26th. Tobin Dep. at 24. The bank froze the account on December 26, 2000—apparently on the same day but immediately following the last payment made by Diagnostic to Dr. Lerner in the amount of $25,000. *Id.* at 21.

As reflected by Diagnostic's balance sheet of December 31, 2000 ("Balance Sheet"), at the time of the Payments, Diagnostic had accounts payable of $1,769,134.35 and a negative net worth of $1,465,012.92. Diagnostic filed for chapter 11 seven business days after the last payment to Dr. Lerner.

*Issue*

There is no genuine issue of material fact or law that the Payments were preferential transfers under Bankruptcy Code section 547(b). That is, there is no genuine issue of fact or law, nor does Dr. Lerner contest that the elements of a pref-

erence are met: (1) the Payments were transfers of an interest of the Debtor in property to a creditor on account of an antecedent debt, (2) made while the Debtor was insolvent, (3) made within 90 days of the petition, and (4) that enabled Dr. Lerner to receive more than he would have received if the transfers had not been made. *See* Notice of Filing Second Request for Admissions to Defendant Hilary Jon Lerner (Doc. No. 186).

What is at issue is one of the affirmative defenses raised by Dr. Lerner. Although Dr. Lerner raised a number of affirmative defenses in his answer to the complaint, it was conceded at the Hearing that the only real dispute for resolution by this Court is whether or not the "ordinary course of business" exception contained in Bankruptcy Code section 547(c)(2) is available to Dr. Lerner as a defense to this preference action. For the reasons set out below, the Court concludes that the Payments do not fall within the "ordinary course of business" exception of section 547(c)(2) and that judgment should be entered against Dr. Lerner for the amount of the Payments.

### Conclusions of Law

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b), 157(b)(1), and 157(b)(2)(F). This is a core proceeding in accordance with 28 U.S.C. § 157(b)(2)(F).

■ As noted above, based upon undisputed facts, the Committee has met its burden to establish the elements of a preference under section 547(b). Accordingly, the burden shifts to Dr. Lerner to establish that one of the exceptions of section 547(c) applies. 11 U.S.C. § 547(g). In this respect, Dr. Lerner relies on the "ordinary course of business exception" contained in section 547(c)(2). Under this provision, the Committee, exercising the

powers of a trustee under the terms of the Plan, may not avoid an otherwise preferential transfer where the transfer was

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

11 U.S.C. § 547(c)(2).

■ The Bankruptcy Code does not define "ordinary course of business" or "ordinary business terms." However, the legislative history of this section makes clear that its underlying purpose "is to leave undisturbed routine and normal financial relations." H.R.Rep. No. 595, 95th Cong., 1st Sess. 373 (1978), U.S.Code Cong. & Admin.News at pp. 5963, 6329; S.Rep. No. 989, 95th Cong., 2d Sess. 88 (1978), U.S.Code Cong. & Admin.News at pp. 5787, 5874. This exception to recovery of an otherwise preferential transfer should be narrowly construed. *In re M & L Business Machine Co., Inc.*, 84 F.3d 1330, 1339 (10th Cir.1996), *cert. denied*, 519 U.S. 1040, 117 S.Ct. 608, 136 L.Ed.2d 534 (1996); *J.P. Fyfe, Inc. of Florida v. Bradco Supply Corp.*, 96 B.R. 474, 476 (D.N.J. 1988), *aff'd*, 891 F.2d 66 (3d Cir.1989). Moreover, in order to establish this defense, all three elements under the statute must be satisfied by the defendant. *Fidelity Savings and Investment Co. v. New Hope Baptist*, 880 F.2d 1172 (10th Cir. 1989).

For the reasons set forth below, the Court concludes that Dr. Lerner has failed to meet his burden as to each of these required elements.

### A. The Debt Was Not Incurred by Diagnostic in the Ordinary Course of Its Business or the Ordinary Course of Dr. Lerner's Business.

█ In the typical preference case, there is no dispute as to the first element that the debt be incurred in the ordinary course of the debtor's and transferee's business or financial affairs. 3 *Norton Bankruptcy Law and Practice* § 57:19 at 57–86 (2d ed.). Most of the unsecured debt of a typical chapter 11 debtor is debt incurred for the purchase of services and materials. In fact, most of Diagnostic's unsecured debt as set forth in its December 31, 2000, balance sheet is composed of approximately $1.7 million of accounts payable. Thus, there is seldom any dispute that debts owing to a debtor's vendors are incurred in the ordinary course of business of both the debtor and the vendor.

However, the instant transaction was not the typical one involving an open-account purchase of materials or services. In contrast to the typical case, the transaction between Diagnostic and Dr. Lerner amounted to an extraordinary loan made by a customer to a debtor. In this case, the Loan was neither in the ordinary course of Diagnostic's business nor of Dr. Lerner's medical practice or his personal financial affairs. With respect to Diagnostic, it only entered into this transaction after it had no further availability on its line of credit. In fact, the Loan was in violation of the terms of that line of credit. Lerner Dep. at 37–38. It was the largest cash advance ever made to Diagnostic by an individual. Tobin Dep. at 13. While Diagnostic had previously entered into transactions with individuals in connection with the purchase of equipment, none of their terms were similar to this one. Tobin Dep. at 26. Rather, they were structured as investments. *Id.*

Similarly, Dr. Lerner did not make the Loan in the ordinary course of his business. He is an ophthalmologist—not a lender. It is without dispute that he has never been involved in a similar transaction. Lerner Dep. at 7.

It is also the Court's conclusion that the terms of the Loan are highly unusual and, indeed, in one respect it appears to be unlawful. For example, the Memo, which sets forth the actual terms of the transaction, varies materially from the Note in that the economic reality of the obligation agreed to by the parties was payment of $25,000 for the use of $250,000 over a period of 57 days. While Dr. Lerner and Tobin attempt to justify the large cost for the use of the funds on the basis that the $25,000 was in part in exchange for "consulting" services, there is absolutely no competent substantial evidence in the record to support this contention. Rather, it appears to the Court that the $25,000 fee charged was for the use of the $250,000, without any contingency or requirement that anything further be provided by Dr. Lerner by way of consulting services.

The question then is: If the $25,000 was not primarily for consulting services, then what is the true nature of the transaction? As an initial matter, the Court notes that the effective interest rate for a transaction in which a borrower agrees to pay a fee of $25,000 in exchange for a loan of $250,000 for a 57–day period is in excess of 60 percent per annum. Such an interest rate is usurious under Florida law.[2]

---

**2.** Under *Fla. Stat.* § 687.03, it is "usury" and therefore unlawful for any person "to reserve, charge, or take for any loan ... a rate of interest greater than the equivalent of 18% per annum simple interest, either directly or indirectly, by way of commission for advances, discounts, or exchange, or by *any contract, contrivance, or device whatever* whereby the debtor is required or obligated to pay a sum of money greater than the actual

In determining whether a transaction is usurious, however, a mathematical computation, standing alone, is not sufficient. *Sharp v. Dixon*, 252 So.2d 805 (Fla. 4th DCA 1971). That is, "the substance of a transaction rather than the form will be examined to determine whether a transaction not cast in the form of a loan nevertheless constitutes a usurious loan transaction." *Growth Leasing, Ltd. v. Gulfview Advertiser, Inc.*, 448 So.2d 1224, 1225 (Fla. 2d DCA 1984); *see also Griffin v. Kelly*, 92 So.2d 515, 518 (Fla.1957) (" 'Where the intent of a party to a bargain is to make a loan of money or an extension of the maturity of a pecuniary debt for a greater profit than is allowed by law, the agreement is illegal though the transaction is put in whole or in part in the form of a sale, a contract to sell or other contract. (internal citation omitted)' "); *In re Omni Capital Group, Ltd.*, 157 B.R. 712, 717 (Bankr.S.D.Fla.1993)("In determining whether a particular loan is usurious, the court must look beyond the terms of the documents themselves and consider the entire substance of the transaction."). Thus, Florida law clearly establishes that a court should look beyond the form of the transaction in determining whether there has been a usurious loan. *Beausejour Corp. v. Offshore Development Co.*, 802 F.2d 1319, 1320 (11th Cir.1986).

In this regard, Florida courts have developed a four-prong test: (1) there must be a loan, expressed or implied; (2) an understanding between the parties that money loaned shall be returned; (3) it must appear that a greater rate of interest than is allowed by law was agreed to be paid; and (4) a corrupt intent to exact more than the legal rate of interest must be present. *In the Matter of Offshore Development Corp. (Beausejour Corp. v. Offshore Development Co.)*, 37 B.R. 96, 101 (Bankr.M.D.Fla.1984) (*citing Sharp v. Dixon*, 252 So.2d 805 (Fla. 4th DCA 1971)).

There is no dispute that the first three elements of the required showing exist in this case. That is, there was a loan of $250,000, there was an understanding reduced to writing that the loan be repaid together with "interest" and "consulting" fees of $25,000 (without any condition or contingency other than the passage of 57 days), and the effective interest rate in excess of 60 percent per annum was far greater than that allowed by Florida law.

As to the remaining element of intent, Florida law requires a showing that the lender intended to charge interest in excess of the statutory maximum. *American Acceptance Corp. v. Schoenthaler*, 391 F.2d 64 (5th Cir.1968), *cert. denied*, 392 U.S. 928, 88 S.Ct. 2287, 20 L.Ed.2d 1387 (1968). However, a borrower need not demonstrate that the lender had any specific intent to violate the usury statutes, but merely that the lender intended to charge or exact interest in excess of the statutorily proscribed rates. *In re Omni Capital Group, Ltd.*, 157 B.R. 712, 717 (Bankr.S.D.Fla.1993)(citing *Antonelli v. Neumann*, 537 So.2d 1027, 1029 (Fla. 3d DCA 1988)); *Matter of Mickler*, 50 B.R. 818, 827 (Bankr.M.D.Fla.1985).

principal sum received, together with interest at the rate of the equivalent of 18% per annum simple interest." § 687.03, Fla. Stat. (emphasis added). Moreover, under section 687.071(3), Fla. Stat., "...any person making an extension of credit to any person, who shall willfully and knowingly charge, take or receive interest thereon at a rate exceeding 45% per annum or the equivalent rate for a longer or shorter period of time, *whether directly or indirectly* or conspire to do so, shall be guilty of a felony...." *Id.* This statutory provision defines such a loan as "criminal usury, loan sharking, and shylocking." Finally, section 697.071(7) provides that "no extension of credit made in violation of any of the provisions of *this Section* shall be an enforceable *debt* in the courts of this state."

There is no dispute that Dr. Lerner was to be paid $25,000 for the use of the funds advanced by him. There was no contingency to the payment of the full $275,000 on December 15, 2000, other than the passage of time. Further, it can be reasonably inferred that the parties were concerned that this was not a proper transaction from the inconsistency between the Memo—which reflects a usurious transaction, and the deceptive Note—which facially reflects a non-usurious transaction. No credible reason has been advanced by Dr. Lerner to explain this discrepancy between the Note and the Memo. The Court can only infer from these circumstances that these parties knew full well what they were doing when they structured a transaction in which Diagnostic agreed to pay an enormous and, in fact, usurious rate of interest under Florida law.

Accordingly, viewed in light of the substance of this transaction, clearly it was not in the ordinary course of the Debtor's business to borrow money at usurious interest rates, nor was it in the ordinary course of Dr. Lerner's business to make such loans. Dr. Lerner has failed to meet his burden with respect to this element of his defense.

**B. The Payments Were Not Made in the Ordinary Course of Business of Either Diagnostic or Dr. Lerner.**

With respect to the second element that the transfers be in the ordinary course of the debtor and the transferee under section 547(c)(2)(B), Dr. Lerner notes that this ordinarily would require the court to examine the prior course of dealings between these two parties and determine if this transaction was in the "ordinary course" when viewed with reference to these transactions. However, since "there is no prior course of dealing between the Debtor and Dr. Lerner, the only

course of business between the parties is their respective conduct in this case." Lerner Motion at 7.

In effect, Dr. Lerner is arguing that where there is only one transaction between two parties involved in an otherwise preferential transaction, that the "ordinary course" defense would always be available since the very transaction in question determines the issue of what is in the "ordinary course" between the parties. For support of this proposition, Dr. Lerner points to the cases of *In re Morren Meat and Poultry Co., Inc.*, 92 B.R. 737 (W.D.Mich.1988) and *In re Empire Pipe and Development, Inc.*, 152 B.R. 1012 (Bankr.M.D.Fla.1993).

In contrast to the situation here, the court in *Morren* had before it a transaction between a wholesale meat supplier and the debtor, a retail seller of meat products. Since this was the only transaction between the parties, the court concluded that the existence of "prior dealings" between the parties was not the *"sine qua non"* in order to afford the transferee of the protections of section 547(c)(2). *Id.* Similarly, in *Empire Pipe*, the court noted that it is appropriate to apply a test that looks to the usual dealing between the parties (the "vertical test") as opposed to the method of transactions between creditors and debtors in the similar industry (the "horizontal test") where there is no method of establishing the normal payments in the industry. *Empire Pipe*, 152 B.R. at 1014.

In *Morren*, however, the court was dealing with a debtor and transferee engaged in typical transactions routinely conducted by both in the regular course of their respective businesses. The debtor was in the business of buying from wholesalers, and the transferee was a wholesaler in the business of selling to retailers such as the debtor. Moreover, the court noted with respect to the subject transfers, "the ab-

sence in these two transfers of any indicia suggesting unusual conduct between" the debtor and the transferee. *Morren* at 741. Rather, "[t]he transfers were simply payments on an open book account with no unusual attempts at collecting the debt." *Id.*

Also in contrast to this case, in *Empire Pipe* the debtor was in the building supply business, and the transferee was a petroleum products distributor who regularly sold petroleum products to the debtor on an open-account basis. Thus, unlike this case, there was a pattern of conduct between the parties to which the court could look in determining whether the alleged preferential transfers were made in the ordinary course of their respective businesses. *Empire Pipe* at 1015.

These two cases have no applicability to this case. We are not dealing here with transfers to suppliers who regularly engage in similar transactions in the ordinary course of their businesses. To be distinguished from cases such as *Morren* and *Empire Pipe,* this was a "one-of-a-kind" transaction both as between Diagnostic and Dr. Lerner and with respect to either party with anyone else. Neither had ever entered into a similar transaction. Tobin Dep. at 25–26; Lerner Dep. at 13, 29.

It appears from the record, therefore, that Tobin was doing what he could to transfer to his "long-time personal friend," Dr. Lerner, every bit of excess cash he had to pay off the Loan (a loan which he had guaranteed) in the days preceding the bank's call of Diagnostic's line of credit. There is no evidence that other creditors were being treated similarly during this period of time. Tobin Dep. at 24. Thus, the Payments can hardly be considered in the ordinary course of Diagnostic's business.

Likewise, the Payments were not in the ordinary course of Dr. Lerner's business or financial affairs. Lending money was not his business, nor did he have any experience in making similar investments.

Even if, assuming *arguendo,* these Payments in themselves could be construed as being in the ordinary course of business, the usurious nature of the Loan in itself would take these Payments outside of this defense. As stated by the court in *In re M & L Business Machine Co., Inc. (M & L Business Machine Co., Inc. v. McKay),* 155 B.R. 531, 537 (Bankr.D.Colo.1993) *aff'd* 84 F.3d 1330 (10th Cir.1996), "What, after all, is the Defendant's ordinary course of business? Lending? Lending at usurious interest rates? Investing? Investing and taking back usurious promissory notes?"

The Court concludes, therefore, that Dr. Lerner has failed to meet his burden with respect to this second required element to his defense.

C. The Payments Were Not Made According to Ordinary Business Terms.

 The language of subsection (c)(2)(C) requires bankruptcy courts to consult industry standards in classifying a disputed transfer. *In re A.W. Associates, Inc.,* 136 F.3d 1439, 1442 (11th Cir.1998). As explained by the Eleventh Circuit in *A.W. Associates,* if the third prong of section 547(c)(2)—which deals with "ordinary business terms"—is meant to have no meaning independent of the relationship between the parties, then (c)(2)(C) would be superfluous and have no meaning beyond that already contained in (c)(2)(B). In this regard, "industry standards" provide an objective basis to "evaluate the parties' self-serving testimony that an extraordinary transaction" was simply a routine ordinary course transaction within the parties' normal business relationship. *Id. (citing to Tolona Pizza,* 3 F.3d 1029, 1032 (7th Cir.1993)).

In addition, use of objective industry standards removes the tailor-made business transaction (designed for the benefit of one creditor) from the types of transactions that the ordinary course of business exception is meant to protect. *Tolona Pizza* at 1032 ("reference to industry standards reassures other creditors that deals have not been worked out favoring a particular creditor, which would permit a preference to slide under the § 547 fence").

■ Accordingly, the standard in determining "ordinary business terms" with respect to a preferential transaction is not derived from the course of conduct between the immediate parties to the transaction. Rather, it must look to the *"range* of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage." *A.W. Associates* at 1443 (emphasis in original). In cases where the preferential transaction is "so idiosyncratic as to fall outside that broad range," then the defense is not available. *Id.*

■ There is no evidence in the record supporting the proposition that the Loan made by Dr. Lerner was made according to "ordinary business terms" within the industry. To the contrary, it is clear that this transaction was quite extraordinary not only in terms of the prior dealings between these parties but also on an objective basis. As noted above, this transaction, properly characterized, was a usurious loan. There is no way it could possibly "come under the penumbra of 'ordinary business terms' with relation to either 'business' or commerce." *In re M & L Business Machine Co., Inc. (M & L Business Machine Co., Inc. v. McKay),* 155 B.R. 531, 537 (Bankr.D.Colo.1993)(promissory note providing for "grossly usurious interest rates" did not contain "ordinary business terms").

Accordingly, Dr. Lerner has failed to carry his burden with respect to this third element of his section 547(c)(2) defense.

*Conclusion*

This case involves an extraordinary transaction between Diagnostic and one of its long-time customers who made a loan outside of the ordinary course of either of the parties' previous dealings. The loan, while characterized as being in part a consulting agreement, in substance was a usurious loan transaction under Florida law. Payments were made by Diagnostic to Dr. Lerner in the days preceding the bankruptcy filing using all available cash at a time when Diagnostic was not making any similar payments to its ordinary trade creditors.

Neither the Loan nor the Payments were made in the ordinary course of business of either Diagnostic or Dr. Lerner. Moreover, the nature of the transaction between Diagnostic and Dr. Lerner was extraordinary under the circumstances and not according to ordinary business terms in any industry. The Court concludes, therefore, that the defense that the Payments were in the "ordinary course of business" within section 547(c)(2) is unavailable under such unique circumstances.

Accordingly, for these reasons, it is

ORDERED:

1. The Committee Motion is granted.

2. The Lerner Motion is denied.

3. Judgment will be entered in favor of the Committee for the amount of the Payments of $175,000.

4. Counsel for the Committee is directed to prepare and provide the Court for entry a form of judgment consistent with this memorandum decision and order.