SALTER, J.
Jose Saralegui and Gustavo Trelles Monteverdi appeal final summary judgments entered against them by the Miami-Dade Circuit Court on claims arising from business transactions arranged by a subsequently-disbarred attorney, Martin Doyle. *1050 The appellants alleged that Doyle’s law firm at the time, appellee Sacher Zelman, Van Sant, Beily, Hartman & Waldman, P.A., and two German companies, GNT Investments, LLC, and GBH, Inc., were liable for the appellants’ losses. Finding no basis in the second amended complaint or the record for such claims, we affirm.
The appellants both resided in Uruguay; Saralegui was a citizen of that country, while Trelles was a citizen of Italy. In late 2002 and early 2003, Doyle was a member and director of the Sacher Zelman law firm in Miami. He had been a member of The Florida Bar since 1984. Based on the suggestion of a family friend named Armando da Silva Tavares, Trelles met with Doyle in October 2002 at the Sacher Zel-man offices to discuss “investment contracts,” according to the second amended complaint. Doyle described various projects in the tens of millions of dollars, but Trelles stated that investments at that level were beyond his reach. Two months later, Tavares told Trelles that Doyle was looking for smaller investors in GNT Investments, said to be a German company establishing a telephone business in Africa. Tavares told Trelles that if he invested $300,000, he would receive $450,000 within thirty days, and that the transaction would be guaranteed by Sacher Zelman.
In January 2003, without discussing a particular transaction with Doyle, anyone else from Sacher Zelman, or anyone at either of the German companies, Trelles went to Tavares’ office in Uruguay and signed a written agreement confirming the $300,000 advance and the $450,000 due Trelles within thirty days. The agreement recited that Trelles was contracting with “Sacher, Zelman, Van Sant, Paul, Beily, Hartman & Waldman, P.A. — Martin Doyle — Trustee, acting solely in his eapacity as a Trustee for a client (“Client”).” The agreement further stated that the “Trustee acts on behalf of an international qualified borrower (“Client”), who is currently participating in an investment project.” Doyle signed as “Trustee.” Trelles wired the funds to the law firm’s trust account as specified by the agreement.
The following month, Saralegui and Doyle signed a nearly-identical document whereby Saralegui was to advance $200,000 and receive $280,000 “no later than twenty-five days” from the advance. Saralegui then wired the funds to the law firm’s trust account.
When neither appellant was repaid by the due date, extension agreements were negotiated by Tavares and signed by Doyle. The repayment dates were extended and the purported repayment amount substantially increased. The final extension agreements were signed by Trelles, Saralegui, and Doyle after a meeting at Sacher Zelman’s office in May 2003. The extension agreements were signed by Doyle as Trustee and without any reference to Sacher Zelman. Also, the German “clients,” appellees GNT and GBH, were identified by name in the May extension agreements, and an individual unconnected with Sacher Zelman signed as “attorney in fact” for those entities.
The second amended complaint alleged that Sacher Zelman and the German companies were liable for breach of contract and negligent misrepresentation. After pretrial discovery, the defendants moved for final summary judgment on all claims. As to all defendants, the trial court determined that the agreements were unenforceable because they were merely loan agreements that violated Florida’s usury laws.[1] In the case of Sacher Zelman, the *1051 trial court ruled on a second ground as well — that Doyle had no authority to bind the law firm to the “transactions” and that the transactions were both “clearly illegal” and “otherwise not within the course and scope” of his employment.

Analysis

The appellants contend that usury and “apparent agency” are issues of fact inappropriate for summary adjudication. On the record here, however, there is no genuine issue of material fact that relates to either point.
In the case of usury, the advance and repayment terms are indicative of a simple loan. No stock, partnership interests, or other indicia of equity were issued to the appellants. The repayment date and repayment amount were absolute and were not made contingent or dependent upon the success of the underlying venture. See Dixon v. Sharp, 276 So.2d 817 (Fla.1973). The element of “corrupt intent” does not require knowledge of the usury statutes themselves by the lender[2] and a specific intention to violate them; rather, it requires proof that the lender intended to collect payments for the loan which, when expressed as a simple rate of interest per annum, exceeded the maximum allowable rate. Am. Acceptance Corp. v. Schoenthaler, 391 F.2d 64 (5th Cir.1968), cert. denied, 392 U.S. 928, 88 S.Ct. 2287, 20 L.Ed.2d 1387 (1968). The appellants’ deposition testimony and allegations in the second amended complaint leave no doubt that they intended to receive $150,000 for a 30-day loan of $300,000 (Trelles), and $80,000 for a 25-day loan of $200,000 (Saralegui).[3] The rest is arithmetic.[4]
The second issue, whether there was any genuine issue of material fact regarding the allegation that Doyle was an “apparent agent” of Sacher Zelman, also was determined correctly by the trial court. As a threshold matter, the appellants did not plead this basis for liability in their second amended complaint. “[I]s-sues that are not pled in a complaint cannot be considered by the trial court at a summary judgment hearing.” Fernandez v. Fla. Nat'l Coll., Inc., 925 So.2d 1096, 1101 (Fla. 3d DCA 2006) (citations omitted).
While “apparent agency” is not a magic phrase or the exclusive incantation necessary to assert the claim, facts sup *1052 porting all three elements must be alleged: “1) a representation by the purported principal; 2) reliance on that representation by a third party; and 3) a change in position by the third party in reliance on the representation.” Ocana v. Ford Motor Co., 992 So.2d 319, 326 (Fla. 3d DCA 2008). The second amended complaint alleged that Doyle acted in the course and scope of his employment with Sacher Zelman, but this was contradicted, not established, by the parties’ submissions before the summary judgment hearing. Sacher Zelman’s representations, if they rise to that,[5] involved Doyle’s authority to render legal advice to firm clients, not his authority to commit the firm as a party to loan agreements. Further, any representations regarding the specific loan transactions were made by Doyle, not by the firm. Finally, the appellants concede that Doyle did not communicate directly with the appellants regarding the transactions until after the advances were made; Doyle’s instructions and alleged promises were made through Tavares and others as intermediaries, with no authorization or ratification by Sacher Zelman.
Had Sacher Zelman retained proceeds of Doyle’s fraudulent scheme in its trust account, the appellants could have chosen from a menu of legal remedies to freeze and obtain recovery of the funds. But in light of the uncontroverted fact that the firm itself did not know Doyle’s disbursement requests were fraudulent, the firm’s receipt and disbursement of funds as requested by Doyle did not ratify Doyle’s purported guarantee on behalf of the law firm.
Doyle and other individuals who were not defendants in the action below planned and executed the fraudulent scheme. Nevertheless, and citing Palafrugell Holdings, Inc. v. Cassel, 940 So.2d 492 (Fla. 3d DCA 2006), the appellants argue that the firm itself assumed a duty to assure that the funds were applied as Doyle allegedly had promised. In Palafrugell, however, the law firm represented (and thus owed fiduciary duties to) the corporate claimant. The law firm claimed the right to rely upon disbursement instructions from Hernandez, the corporation’s agent designated to consummate the business transaction. When Hernandez engaged in self-dealing to the detriment of the law firm’s corporate client, however (by disbursing some of the funds to himself), this “should have created a reasonable doubt in the mind of [the law firm’s attorney administering the disbursements] and caused him to inquire further of his client about the extent of the agent’s authority.” Id. at 494.
In Palafrugell, the law firm alleged that its client’s agent had apparent authority to disburse funds to himself. We concluded that this presented an issue of fact because the self-dealing was obvious and the firm had a fiduciary duty to the principal. In contrast, in this case the alleged agent’s (Doyle’s) self-dealing was then unknown to the law firm as principal, and the law firm did not represent the persons who advanced the funds. This case is thus completely distinguishable from Palafrugell.

Conclusion

Doyle’s fraud was also a fraud upon Sacher Zelman, and it resulted in his per *1053 manent disbarment from The Florida Bar. Unfortunately, citizens of other countries may be familiar with transactions in their own countries in which lawyers and law firms wear multiple hats as principals, brokers or intermediaries, and legal advisors in business transactions, but our system draws clear distinctions among these roles and clear boundaries between the legal representation of a lender and a borrower. Had the appellants retained a Florida lawyer to give them independent advice before making these loans, the faeially-obvious usury and questionable “trusteeship” proposed by Doyle on behalf of the borrowing entity surely would have caused legal eyebrows to rise and the investors to flee.
The trial court correctly declined to stretch the rules of pleading and apparent agency beyond their limits. Summary judgment was proper.
Affirmed.

. Ch. 687, Fla. Slat. (2003). The return on Trelles' advance would have been an annual, simple interest equivalent rate exceeding 600%, while Saralegui’s return would have *1051 been above 580%. Under applicable Florida law, an annual simple interest equivalent return exceeding 25% on this type of loan constitutes criminal usury. Unpaid interest and principal are unenforceable with respect to such a loan, and additional penalties would also apply. § 687.071, Fla. Stat. (2003). The trial court correctly determined that there was no genuine dispute that the purported transactions, even if referred to as "investments,” were actually short-term loans.

. Indeed, ignorance of the usury statutes is not a defense. Ross v. Whitman, 181 So.2d 701 (Fla. 3d DCA 1966); Matter of Mickler, 50 B.R. 818 (Bankr.M.D.Fla.1985).

. The amounts repayable under the extension agreements involved similarly astronomical interest rates.

.The illegality and unenforceability of the loans as to Sacher Zelman does not mean that claims such as fraud, conversion, racketeering, and civil theft could not have been brought against Doyle individually. Consider a transaction in which an individual lured an unsuspecting lender into a similar short-term loan to a third party at 26% per annum interest or higher, but then misapplied the loan proceeds (such that the designated third party did not receive them). In that example, the loan itself might well be illegal as a commercial transaction, but the defrauded lender would nonetheless have an array of claims available against the person executing the fraud.

. Mere biographical information on a law firm website regarding a member of the firm does not constitute a representation that the law firm has authorized its member to enter into commercial loan or guaranty agreements on behalf of the firm. Nor could the appellants conclude from these materials, the contracts, or the Trellis-Doyle meeting that they were “clients” of Sacher Zelman. To the contrary, the contracts expressly stated that the borrowing entities (not the appellants) were Doyle's clients. Sacher Zelman was not retained to provide legal advice to the appellants, and they paid no fee to the firm.